Karen I. Boyd (SBN 189808)
boyd@turnerboyd.com
TURNER BOYD LLP
702 Marshall Street, Suite 640
Redwood City, CA 94063
Telephone: (650) 521-5930
Fax: (650) 521-5931

Michael H. Bunis
mbunis@choate.com
Paul D. Popeo
ppopeo@choate.com
Margaret E. Ives
mives@choate.com
CHOATE, HALL & STEWART LLP
Two International Place, Boston, MA 02110
Telephone: (617) 248-5000
Facsimile: (617) 248-4000

Attorneys for Defendants
SAPHENA MEDICAL, INC. and
ALBERT CHIN

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| MAQUET CARDIOVASCULAR LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>SAPHENA MEDICAL, INC. and<br>ALBERT CHIN,<br><br>    Defendants. | Case No. 3:16-cv-07213-WHA<br><br><br>**ANSWER AND COUNTERCLAIMS<br>OF DEFENDANTS ALBERT CHIN AND<br>SAPHENA MEDICAL, INC.** |

**ANSWER AND COUNTERCLAIMS OF DEFENDANTS
ALBERT CHIN AND SAPHENA MEDICAL, INC.**

Defendants Saphena Medical, Inc. ("Saphena") and Dr. Albert Chin ("Dr. Chin")

(collectively, "Defendants") hereby answer the First Amended Complaint ("Complaint") filed by

Plaintiff Maquet Cardiovascular LLC ("Maquet") as follows (headings from the Complaint are

included for convenience, but are not allegations to which a response is required):

**Answer and Counterclaim of Defendants**          - 1 -          CASE NO. 3:16-CV-07213-WHA

1.      Defendants deny the allegations of Paragraph 1 of the Complaint, and deny that either has infringed any valid claim of any patent asserted in the Complaint.

2.      Defendants deny the allegations of Paragraph 2 of the Complaint, and deny that Dr. Chin has breached any valid contract with Maquet, or that Maquet has suffered any harm due to any action of Dr. Chin.

3.      Defendants deny the allegations of Paragraph 3 of the Complaint, and deny that either has engaged in false or misleading advertising of any kind.

**THE PARTIES**

4.      Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 4 of the Complaint, including the significance or identity of the "innovative" medical solutions Maquet says it developed in the 1830's, and therefore deny those allegations.

5.      Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 5 of the Complaint, and therefore deny those allegations.

6.      Defendant Chin denies the allegations of Paragraph 6 of the Complaint, except admits that in 1989, he co-founded a company called Origin Medsystems, that later was acquired by Eli Lilly and Company, spun out of Eli Lilly as Guidant Corporation, which itself was subsequently purchased by Boston Scientific Corporation.  Dr. Chin further admits that the Boston Scientific Corporation business unit apparently most related to the former Origin Medsystems business that Chin and other shareholders sold to Guidant Corporation was acquired by Maquet from Boston Scientific in or about 2008.  Defendant Chin further admits that throughout his career, he has researched and innovated medical devices for use in surgical procedures and that, while employed by Maquet, his research included subjects in or relating to endoscopic vessel harvesting ("EVH") tools and techniques.  Defendant Saphena is without information or knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 6 of the Complaint, and therefore denies those allegations.

7.      Defendant Chin denies the allegations of Paragraph 7 of the Complaint, except admits that he once was employed by Maquet, and that while so employed he continued his research and at times attended conferences and meetings.  Defendant Saphena is without information or knowledge

sufficient to form a belief as to the truth of the allegations of Paragraph 7 of the Complaint, and therefore denies those allegations.

8.     Defendant Chin denies the allegations of Paragraph 8 of the Complaint, except admits that, while employed at companies which became acquired by Maquet, and later for a time as a Maquet employee, he continued to pursue his research and development of potential devices for use in surgical procedures, including for EVH, and that his research included efforts that, it was hoped, might facilitate the performance of EVH in a "one-pass" technique, as he understands that term.  Dr. Chin further admits that he is the named inventor on multiple patents that have been assigned to Maquet.  Defendant Saphena is without knowledge sufficient to form a belief as to the allegations in Paragraph 8 of the Complaint, and therefore denies them.

9.     Defendant Chin denies that his residence in California is "relevant to this Complaint," but admits that he currently resides in  Palo Alto, California.  Defendant Saphena is without information and knowledge sufficient to form a belief as to Dr. Chin's residential history or residency status, and therefore denies the allegations of Paragraph 9 of the Complaint.

10.     Defendants deny the allegations of Paragraph 10 of the Complaint, except Defendant Chin admits that he terminated employment with Maquet in October 2009, and admits that later, in December 2009, he co-founded an incubator for innovative medical device start-ups named Pavilion Medical Innovations, LLC.  Defendants further admit that Saphena Medical, Inc. was co-founded by Defendant Chin in 2013.  Defendant Saphena is without information and knowledge sufficient to form a belief as to Dr. Chin's employment history or status prior to his co-founding of Saphena, and therefore denies the allegations of Paragraph 10 of the Complaint relating thereto.

11.     Defendants admit that Saphena is incorporated under the laws of the state of Delaware, and that it maintains a principal place of business in Massachusetts at 375 West Street, West Bridgewater, Massachusetts. Defendants further admit that Saphena's registered agent for service of process is Corporation Services Company.

**JURISDICTION AND VENUE**

12.     Defendants deny the allegations of Paragraph 12 of the Complaint, except admit that the Complaint purports to state a cause of action for patent infringement under the Patent Act, 35

**Answer and Counterclaim of Defendants**          - 3 -          CASE NO. 3:16-CV-07213-WHA

U.S.C. § 271.  Paragraph 12 states a legal conclusion to which no response is required.  To the extent a response is required, Defendants admit that this Court has subject matter jurisdiction over claims of patent infringement under 28 U.S.C. §§ 1331 and 1338(a).  Defendants deny that they have infringed any valid claim of any of the patents asserted in the Complaint.

13.     Paragraph 13 states a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 13 of the Complaint.

14.     Defendants deny allegations of Paragraph 14 of the Complaint, except admit that Saphena conducts business in the State of California.  Defendants further state that Paragraph 14 states a legal conclusion to which no response is required.

15.     Paragraph 15 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendants admit that Dr. Chin resides at 1638 Portola Avenue, Palo Alto, California, 94306.

16.     Paragraph 16 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny that this District is a convenient forum for the parties and potential witnesses.

17.     Paragraph 17 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendant Chin denies the allegations in Paragraph 17 of the Complaint. Defendant Saphena is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 17, and therefore denies those allegations.

**INTRADISTRICT ASSIGNMENT**

18.     Paragraph 18 of the Complaint states a legal conclusion to which no response is required.

**BACKGROUND**

19.     Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 19, and therefore deny those allegations.

**A.      Dr. Chin's Employment with Maquet**

20.     Dr. Chin denies the allegations of Paragraph 20 of the Complaint, except admits that: (1) that Eli Lilly at a certain time acquired Origin; (2) that Eli Lilly at a certain time spun off Origin

as Guidant Corporation ("Guidant"); (3) that Boston Scientific Corporation ("BSC") at a certain time acquired Guidant; and (4) Maquet acquired a BSC business unit in or about 2008 that was apparently most related to the former Origin Medsystems business that Chin and other shareholders sold to Guidant Corporation. Defendant Chin further admits that he was employed with Origin MedSystems ("Origin") in 1989, that at certain times he held the title of Vice President of Research, and that his employment continued through subsequent acquisitions. Defendant Chin further admits that at a certain time, he held the title "Chief Innovation Officer" of Maquet Cardiovascular LLC. Defendant Saphena is without information or knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 20, and therefore denies those allegations.

21.   Defendant Chin denies the allegations of Paragraph 21 of the Complaint, except admits that he was paid by Maquet during his employment with Maquet. Defendant Saphena is without information or knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 21, and therefore denies those allegations.

22.   Defendant Chin denies the allegations of Paragraph 22 of the Complaint, except admits that he and Origin entered into a Proprietary Information and Inventions Agreement dated July 12, 1989; that he and BSC entered into a Proprietary Information Agreement dated April 28, 2006; that he and Maquet entered into an At-Will Employment, Confidential Information, and Invention Assignment Agreement dated May 29, 2008; and that he and Maquet entered into a Termination Certification dated October 1, 2009. Defendants admit that documents purporting to be those agreements are attached to the Complaint as Exhibits 4-7. Defendant Saphena is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations of Paragraph 22, and therefore denies those allegations.

23.   Defendants deny the allegations of Paragraph 23 of the Complaint and state that the agreements therein speak for themselves. Defendants deny any characterization of those agreements in Paragraph 23 of the Complaint that is inconsistent with the plain language of those agreements or that suggests that those agreements impose identical obligations on Dr. Chin. Defendants further state that the provisions of those agreements set out different and, in some instances, conflicting restrictions.

**Answer and Counterclaim of Defendants**          - 5 -          CASE NO. 3:16-CV-07213-WHA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 1.    The Proprietary Information and Inventions Agreement

24.    Defendants state that Paragraph 1 of the Proprietary Information and Inventions Agreement entered into between Dr. Chin and Origin speaks for itself.  Defendants deny any characterization of Paragraph 1 of the Proprietary Information and Inventions Agreement set forth in Paragraph 24 of the Complaint that is inconsistent with the plain language of Paragraph 1.

25.    Defendants state that Paragraph 2 of the Proprietary Information and Inventions Agreement entered into between Dr. Chin and Origin speaks for itself.  Defendants deny any characterization of Paragraph 2 of the Proprietary Information and Inventions Agreement set forth in Paragraph 25 of the Complaint that is inconsistent with the plain language of Paragraph 2.

26.    Defendants state that Paragraph 3(a) of the Proprietary Information and Inventions Agreement entered into between Dr. Chin and Origin speaks for itself.  Defendants deny any characterization of Paragraph 3(a) of the Proprietary Information and Inventions Agreement set forth in Paragraph 26 of the Complaint that is inconsistent with the plain language of Paragraph 3(a).

27.    Defendants state that Paragraph 3(c) of the Proprietary Information and Inventions Agreement entered into between Dr. Chin and Origin speaks for itself.  Defendants deny any characterization of Paragraph 3(c) of the Proprietary Information and Inventions Agreement set forth in Paragraph 27 of the Complaint that is inconsistent with the plain language of Paragraph 3(c).

28.    Defendants state that Paragraph 3(d) of the agreement between Origin and Dr. Chin speaks for itself, but deny that Paragraph 28 presents a materially complete quotation.  Defendants further state that the final sentence of paragraph 3(d) of the Origin agreement also states: "I understand that I may overcome the presumption by showing that such Invention was conceived after the termination of my employment."  Defendants deny any characterization of Paragraph 3(d) of the Proprietary Information and Inventions Agreement set forth in Paragraph 28 of the Complaint that is inconsistent with the plain language of Paragraph 3(d).

29.    Defendants deny the allegations in Paragraph 29 regarding paragraph 2(b) of the agreement between Origin and Dr. Chin.  Defendants further state that the Origin agreement does not contain a paragraph numbered 2(b).

**Answer and Counterclaim of Defendants**        - 6 -        CASE NO. 3:16-CV-07213-WHA

30.     Defendants state that Paragraph 9 of the Proprietary Information and Inventions Agreement entered into between Dr. Chin and Origin speaks for itself.  Defendants deny any characterization of Paragraph 9 of the Proprietary Information and Inventions Agreement set forth in Paragraph 30 of the Complaint that is inconsistent with the plain language of Paragraph 9.

31.     Defendant Saphena is without information or knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 31 of the Complaint, and therefore denies those allegations. Defendant Chin denies the allegations contained in Paragraph 31 of the Complaint, except admits that his signature appears on Exhibit 4.

**2.      The Proprietary Information Agreement**

32.     Defendants state that Paragraph 1(a) of the Proprietary Information Agreement entered into between Dr. Chin and BSC speaks for itself.  Defendants deny any characterization of Paragraph 1(a) of the Proprietary Information Agreement set forth in Paragraph 32 of the Complaint that is inconsistent with the plain language of Paragraph 1(a).

33.     Defendants deny that Paragraph 33 of the Complaint presents a materially complete quotation, and state that Paragraph 2(b) of the Proprietary Information Agreement entered into between BSC and Dr. Chin speaks for itself.  Defendants further state that the remainder of Paragraph 2(b) of the BSC agreement states that "I recognize, however, that Section 2870 of the California Labor Code (as set forth in Exhibit B hereto) exempts from assignment under this provision any invention as to which I can prove the following: (i) It was developed entirely on my own time, and (ii) No equipment, supplies, facility, or trade secret of the Company was used in its development; and it either does not relate, at the time it was conceived or reduced to practice, to the Company's business or to the Company's actual or demonstrably anticipated research or development, or (aa) does not result from any work performed by me for the Company."  Defendants deny any characterization of Paragraph 2(b) of the Proprietary Information Agreement set forth in Paragraph 33 of the Complaint that is inconsistent with the plain language of Paragraph 2(b).

34.     Defendants state that page 2 of the Proprietary Information Agreement entered into between Dr. Chin and BSC speaks for itself.  Defendants deny any characterization of page 2 of the

**Answer and Counterclaim of Defendants**          - 7 -          CASE NO. 3:16-CV-07213-WHA

Proprietary Information Agreement set forth in Paragraph 34 of the Complaint that is inconsistent with the plain language of page 2.

35.     Defendants state that Paragraph 6(d) of the Proprietary Information Agreement entered into between Dr. Chin and BSC speaks for itself.  Defendants deny any characterization of Paragraph 6(d) of the Proprietary Information Agreement set forth in Paragraph 35 of the Complaint that is inconsistent with the plain language of Paragraph 6(d).

36.     Defendant Saphena is without information or knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 36 of the Complaint, and therefore denies those allegations. Defendant Chin denies the allegations contained in Paragraph 36 of the Complaint, except admits that his signature appears on Exhibit 5.

### 3.     The Confidential Information, and Invention Assignment Agreement

37.     Defendants deny that Paragraph 37 of the Complaint presents a materially complete quotation, and state that Paragraph 3(a) of the At-Will Employment, Confidential Information, and Invention Assignment Agreement entered into between Dr. Chin and Maquet speaks for itself. Defendants deny any characterization of Paragraph 37 of the At-Will Employment, Confidential Information, and Invention Assignment Agreement set forth in Paragraph 37 of the Complaint that is inconsistent with the plain language of Paragraph 37.

38.     Defendants state that Paragraph 5(b) of the At-Will Employment, Confidential Information, and Invention Assignment Agreement entered into between Dr. Chin and Maquet speaks for itself.  Defendants deny any characterization of Paragraph 5(b) of the At-Will Employment, Confidential Information, and Invention Assignment Agreement set forth in Paragraph 38 of the Complaint that is inconsistent with the plain language of Paragraph 5(b).

39.     Defendants deny that Paragraph 39 of the Complaint represents a materially complete quotation, and state that Paragraph 6 of the At-Will Employment, Confidential Information, and Invention Assignment Agreement entered into between Dr. Chin and Maquet speaks for itself. Defendants deny any characterization of Paragraph 6 of the At-Will Employment, Confidential

Information, and Invention Assignment Agreement set forth in Paragraph 39 of the Complaint that is inconsistent with the plain language of Paragraph 6.

40.     Defendant Saphena is without information or knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 40 of the Complaint, and therefore denies those allegations.  Defendant Chin denies the allegations contained in Paragraph 40 of the Complaint, except admits that his signature appears on Exhibit 6.

### 4.      The Termination Certification

41.     Defendant Saphena is without information or knowledge sufficient  to form a belief as to the truth of the allegations of Paragraph 41 of the Complaint, and therefore denies those allegations.  Defendant Chin denies the allegations contained in Paragraph 41 of the Complaint, except admits that he signed the Termination Certificate around the time of terminating his employment with Maquet.

42.     Defendants state that the second paragraph of the Termination Certificate speaks for itself.  Defendants deny any characterization of the second paragraph of the Termination Certificate set forth in Paragraph 42 of the Complaint that is inconsistent with the plain language of the second paragraph of that agreement.

43.     Defendants state that the third paragraph of the Termination Certificate speaks for itself.  Defendants deny any characterization of the third paragraph of the Termination Certificate set forth in Paragraph 43 of the Complaint that is inconsistent with the plain language of the third paragraph of that agreement.

44.     Defendant Saphena is without information or knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 44 of the Complaint, and therefore denies those allegations.  Defendant Chin denies the allegations contained in Paragraph 44 of the Complaint, except admits that his signature appears on Exhibit 7.

### B.      Maquet's Confidential and Proprietary Information

45.     Defendant Chin denies the allegations of Paragraph 45 of the Complaint, except admits that he was employed by Maquet as its Chief Innovation Officer and that he had access to his own research while employed at Maquet.  Defendant Saphena is without information or knowledge

**Answer and Counterclaim of Defendants**          - 9 -          CASE NO. 3:16-CV-07213-WHA

sufficient to form a belief as to the truth of the allegations of Paragraph 45 of the Complaint, and therefore denies those allegations.

46.     Defendant Chin denies the allegations of Paragraph 46 of the Complaint, except admits that, as a Maquet employee, he had access to certain prototypes, designs, and animal research facilities.  Defendant Saphena is without information or knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 46 of the Complaint, and therefore denies those allegations.

47.     Defendant Chin denies the allegations of Paragraph 47 of the Complaint, except admits that he carried out certain clinical tests and developed certain EVH tools while employed by Maquet.  Defendant Saphena is without information or knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 47 of the Complaint, and therefore denies those allegations.

48.     Defendant Saphena is without information or knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 48, and therefore denies those allegations.  Defendant Chin denies the allegations in Paragraph 48 of the Complaint, except admits that he participated in conferences and visited Maquet's customers, including with Maquet sales representatives, while employed with Maquet.

49.     Dr. Chin denies the allegations of Paragraph 49 of the Complaint, except admits that, while at Maquet, he researched a potential "one pass" device, as he understands that term.  Dr. Chin further admits that he has referred to certain EVH concepts he was working on at Maquet as "Torpedo."  Dr. Chin further admits that he is the named inventor on certain patents assigned to Maquet.  Defendant Saphena is without information or knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 49 of the Complaint, and therefore denies those allegations.

50.     Defendant Chin denies the allegations in Paragraph 50 of the Complaint.  Defendant Saphena is without information or knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 50 of the Complaint, and therefore denies those allegations.

51.     Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 51 of the Complaint, and therefore deny those allegations.

52.     Defendant Chin denies the allegations of Paragraph 52 of the Complaint, except admits that he periodically conducted certain tests of BSC products at animal studies while employed

by BSC.  Defendant Chin denies having conducted tests of any prototype device purportedly created by Mr. Ung.  Defendant Chin is without information or knowledge sufficient to form a belief as to the truth of the remainder of the allegations of Paragraph 52 of the Complaint, and therefore denies those allegations.  Defendant Saphena is without information or knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 52 of the Complaint, and therefore denies those allegations.

53.     Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 53 of the Complaint, and therefore deny those allegations.

**C.     Maquet's Patented Inventions at Issue**

54.     Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 54 of the Complaint, and therefore deny those allegations, except admit that Dr. Chin is listed on the face of U.S. Patent No. 5,916,233 ("the '233 Patent") as the sole inventor, and that Maquet Cardiovascular LLC is listed on the face of the '233 Patent as the assignee. Defendants further admit that Dr. Chin is listed on the face of U.S. Patent No. 7,534,243 ("the '243 Patent") as one of four inventors, and that Origin Medsystems, Inc. (which was ultimately acquired by Maquet) is listed on the face of the '243 Patent as the assignee.

55.     Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 55 of the Complaint, and therefore deny those allegations. Defendants admit that a document attached to the Complaint as Exhibit 8 purports to describe the EVH products identified in Paragraph 55 of the Complaint.

**1.     The '233 Patent**

56.     Defendants deny the allegations of Paragraph 56 of the Complaint, except admit that: (1) a copy of the '233 Patent is attached to the Complaint as Exhibit 1; (2) the attached copy of the '233 Patent states on its face that it was issued on June 29, 1999, and; (3) the attached copy of the '233 Patent states on its face that Origin Medsystems, Inc. was the assignee of the patent at the time of its issuance.

57.     Defendants deny the allegations in Paragraph 57 of the Complaint, except admit that EVH is a surgical technique for harvesting a vessel that generally includes inserting a surgical device through an incision near the vessel.  The remainder of Paragraph 57 states a legal conclusion to which

no response is required.  To the extent any further response is required, Defendants state that the proper construction of the claims of the '233 Patent is a matter for the Court's determination and will be fully briefed by the parties in accordance with the Court's schedule.

58.    Defendants deny the remaining allegations in Paragraph 58 of the Complaint, and state that Paragraph 58 states a legal conclusion to which no response is required.  To the extent any further response is required, Defendants state that the proper construction of the claims of the '233 Patent is a matter for the Court's determination and will be fully briefed by the parties in accordance with the Court's schedule.

### 2.    The '986 Patent

59.    Defendants deny the allegations of Paragraph 59 of the Complaint, except admit that: (1) a copy of U.S. Patent No. 6,705,986 ("the '986 Patent") is attached to the Complaint as Exhibit 2; (2) the attached copy of the '986 Patent states on its face that it was issued on March 16, 2004, and; (3) the attached copy of the '986 Patent states on its face that Embro Corp. was the assignee of the patent at the time of its issuance.  Defendants are without information or knowledge sufficient to form a belief as to the truth of the remainder of the allegations of Paragraph 59 of the Complaint, and therefore deny those allegations.

60.    Defendants deny the remaining allegations in Paragraph 60 of the Complaint, and state that Paragraph 60 states a legal conclusion to which no response is required.  To the extent any further response is required, Defendants state that the proper construction of the claims of the '986 Patent is a matter for the Court's determination and will be fully briefed by the parties in accordance with the Court's schedule.

61.    Defendants deny the remaining allegations in Paragraph 61 of the Complaint, and state that Paragraph 61 states a legal conclusion to which no response is required.  To the extent any further response is required, Defendants state that the proper construction of the claims of the '986 Patent is a matter for the Court's determination and will be fully briefed by the parties in accordance with the Court's schedule.

### 3. The '243 Patent

62.     Defendants deny the allegations of Paragraph 62 of the Complaint, except that they admit that: (1) a copy of the '243 Patent is attached to the Complaint as Exhibit 3; (2) the attached copy of the '243 Patent states on its face that it was issued on May 19, 2009, and; (3) the attached copy of the '243 Patent states on its face that Maquet Cardiovascular, LLC was the assignee of the patent at the time of its issuance.

63.     Defendants deny the allegations of Paragraph 63 of the Complaint, and state that Paragraph 63 states a legal conclusion to which no response is required.  To the extent any further response is required, Defendants state that the proper construction of the claims of the '243 Patent is a matter for the Court's determination and will be fully briefed by the parties in accordance with the Court's schedule.

64.     Defendants deny the allegations in Paragraph 64 of the Complaint, and state that Paragraph 64 states a legal conclusion to which no response is required.  To the extent any further response is required, Defendants state that the proper construction of the claims of the '243 Patent is a matter for the Court's determination and will be fully briefed by the parties in accordance with the Court's schedule.

### D. Dr. Chin's Work with Saphena

65.     Defendants deny the allegations in Paragraph 65 of the Complaint, except admit that after Dr. Chin left Maquet he co-founded Pavilion Medical Innovations, LLC ("Pavilion"), an incubator for innovative medical device start-ups.  Defendants further admit that Dr. Chin co-founded Saphena in January 2013 as one of the innovative medical device companies incubated by Pavilion.

66.     Defendants deny the allegations in Paragraph 66 of the Complaint.

67.     Defendants deny the allegations of Paragraph 67 of the Complaint, except admit that Saphena markets and sells the Venapax System for EVH to customers throughout the United States.  Dr. Chin further admits that he maintains a lab in San Carlos, California which he uses to create prototypes of medical devices.

68.     Defendants deny the allegations in Paragraph 68 of the Complaint, except admit that Saphena sells the Venapax System to hospitals, doctors, and physician assistants, in the United States, including a limited number of sales in California.

69.     Defendants deny the allegations of Paragraph 69 of the Complaint, except admit that Michael Glennon is the president and CEO of Saphena.  Defendants further state that Scott Drikakis, Cindy Duwe, and Calvin Magee are independent product representatives who sell multiple different products made by multiple different manufacturers.

70.     Defendants deny the allegations in Paragraph 70 of the Complaint, except admit that Maquet and Saphena entered into discussions about Maquet's interest in acquiring Saphena's Venapax technology following execution of a non-disclosure agreement.

71.     Defendants deny the allegations of Paragraph 71 of the Complaint.

72.     Defendants deny the allegations of Paragraph 72 of the Complaint, except admit that the Venapax System competes with certain Maquet products.

73.     Defendants deny the allegations of Paragraph 73 of the Complaint, except admit that Exhibit 9 to the Complaint purports to contain a description of the Venapax System.  Defendants admit that Exhibit 9 contains, *inter alia*, the language quoted in Paragraph 73 of the Complaint.

74.     Defendants deny the allegations of Paragraph 74 of the Complaint, except admit that Exhibit 9 contains, *inter alia*, the language quoted in Paragraph 69.

75.     Defendants deny the allegations of Paragraph 75 of the Complaint, except admit that Exhibit 10 to the Complaint purports to be a copy of the Venapax System's Instructions for Use, which speaks for itself.  Defendants deny that the Venapax system was developed solely for use with the Maquet 7mm endoscope.

76.     Defendants deny the allegations of Paragraph 76 of the Complaint, except admit that the Venapax System is registered with the Food and Drug Administration.  Defendants admit that a document purporting to be a copy of the FDA registration for the Venapax System is attached to the Complaint at Exhibit 11.  Defendants admit that a Premarket Notification was filed by Saphena in connection with the Venapax System and that Exhibit 12 to the Complaint purports to be a copy of that filing.

77.     Defendants deny the allegations of Paragraph 77 of the Complaint, except admit that Exhibit 12 contains the language quoted in Paragraph 77.

78.     Defendants deny the allegations of Paragraph 78 of the Complaint.

79.     Defendants deny the allegations of Paragraph 79 of the Complaint, except admit that Saphena makes the Venapax System and sells it in the United States, including a limited number of sales in California.  Defendants admit that multiple doctors and hospitals have evaluated and/or used the Venapax System.

80.     Defendants deny the allegations of Paragraph 80 of the Complaint, except admit that Saphena has developed and continues to develop the Venapax system based on feedback from customers and practitioners in the EVH space.  Defendants further admit that Saphena markets and sells the Venapax system in the United States, including California.

**E.      Saphena's False and/or Misleading Marketing of the Venapax System**

81.     Defendants deny the allegations of Paragraph 81 of the Complaint, and state that Paragraph 81 does not adequately specify (beyond quoting the title of one slide) which marketing presentation its allegations are based upon, nor is that presentation attached as an exhibit to the Complaint.  Defendants are thus without information or knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 81 regarding the "Common Arguments Debunked" slide, and therefore deny those allegations.

82.     Defendants deny the allegations of Paragraph 82 of the Complaint, and state that Paragraph 82 does not adequately specify which marketing presentation its allegations are based upon, nor is that presentation attached as an exhibit to the Complaint.  Defendants are thus without information or knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 82, and therefore deny those allegations.

83.     Defendants deny the allegations of Paragraph 83 of the Complaint, except admit that JoAnn Montecalvo gave a presentation, sponsored by Saphena, at the 35th Annual Meeting of the Association of Physician Assistants in Cardiovascular Surgery (APACVS).  Defendant Saphena denies that Ms. Montecalvo's presentation contained any false or misleading statements made on Saphena's behalf.

**Answer and Counterclaim of Defendants**        - 15 -        CASE NO. 3:16-CV-07213-WHA

84.     Defendants deny the allegations of Paragraph 84 of the Complaint, except admit that Jerene Bitondo also gave a presentation, sponsored by Saphena, at the APACVS conference. Defendant Saphena denies that Ms. Bitondo's presentation contained any false or misleading statements made on Saphena's behalf.

85.     Defendants deny the allegations of Paragraph 85 of the Complaint, except admit that Matthew Petrides recorded a testimonial video, sponsored by Saphena, regarding his experience with the Venapax System.  Defendant Saphena denies that Mr. Petrides' video contains any false or misleading statements made on Saphena's behalf.

## CLAIM 1 – INFRINGEMENT OF U.S. PATENT NO 5,916,233

86.     Defendants repeat, reallege, and incorporate by reference their responses to the allegations of Paragraphs 1-85 of the Complaint as if fully set forth herein.

87.     Defendants deny the allegations of Paragraph 87 of the Complaint.

88.     Defendants deny the allegations of Paragraph 88 of the Complaint, except that Defendants admit that copies of Exhibits 10, 13, and 14 are attached to the Complaint.

89.     Defendants deny the allegations of Paragraph 89 of the Complaint, and state that the document attached as Exhibit 9 speaks for itself.  Defendants deny any characterization of that Exhibit that is inconsistent with its plain language.  Defendants admit that the Venapax System is a surgical apparatus used in endoscopic vessel harvesting and has an elongated cannula.

90.     Defendants deny the allegations of Paragraph 90 of the Complaint, except admit that Dr. Chin is listed as an inventor on the '233 Patent and that he had knowledge of the '233 Patent. Defendants admit Exhibit 13, attached to the Complaint, purports to be a copy of a letter from Maquet to Saphena, dated May 20, 2014.  The document attached as Exhibit 13 speaks for itself.  Defendants deny any characterization of that document that is inconsistent with its plain language.  Defendants admit that Dr. Chin and other physicians have used the Venapax device in California and elsewhere.

91.     Defendants deny the allegations of Paragraph 91 of the Complaint.

92.     Defendants deny the allegations of Paragraph 92 of the Complaint.

93.     Defendants deny the allegations of Paragraph 93 of the Complaint, except admit that the Complaint purports to seek damages, a permanent injunction, and attorneys' fees and costs.

**Answer and Counterclaim of Defendants**      - 16 -       CASE NO. 3:16-CV-07213-WHA

Defendants deny that Plaintiff is entitled to damages, a permanent injunction, and/or attorneys' fees and costs.

## CLAIM 2 – INFRINGEMENT OF U.S. PATENT NO. 6,705,986

94.     Defendants repeat, reallege, and incorporate by reference their responses to the allegations of Paragraphs 1-93 of the Complaint as if fully set forth herein.

95.     Defendants deny the allegations of Paragraph 95 of the Complaint.

96.     Defendants deny the allegations of Paragraph 96 of the Complaint, and state that the document attached as Exhibit 15 speaks for itself.  Defendants deny any characterization of Exhibit 15 that is inconsistent with its plain language.  Defendants deny that they have known, or have willfully blinded themselves to knowing, that any action on Defendants' part would result, could result, or has resulted in any of Saphena's customers infringing any valid patent of Plaintiff's.  Moreover, Defendants deny that they have in any way induced, encouraged, or facilitated infringement of any valid patent of Plaintiff's.

97.     Defendants deny the allegations of Paragraph 97 of the Complaint, and state that the document attached as Exhibit 9 speaks for itself.  Defendants deny any characterization of that Exhibit that is inconsistent with its plain language.  Defendants admit that the Venapax System is a surgical apparatus used in endoscopic vessel harvesting.

98.     Defendants deny the allegations in Paragraph 98 of the Complaint, and state that the document attached as Exhibit 15 speaks for itself.  Defendants deny any characterization of that Exhibit that is inconsistent with its plain language.  Defendants admit that Dr. Chin and other physicians have used the Venapax device in California and elsewhere.

99.     Defendants deny the allegations of Paragraph 99 of the Complaint.

100.     Defendants deny the allegations of Paragraph 100 of the Complaint.

101.     Defendants deny the allegations of Paragraph 101 of the Complaint, except admit that the Complaint seeks damages, a permanent injunction, and attorneys' fees and costs.  Defendants deny that Plaintiff is entitled to damages, a permanent injunction, and/or attorneys' fees and costs.

## CLAIM 3 – INFRINGEMENT OF U.S. PATENT NO. 7,534,243

102.    Defendants repeat, reallege, and incorporate by reference their responses to the allegations of Paragraphs 1-101 of the Complaint as if fully set forth herein.

103.    Defendants deny the allegations of Paragraph 103 of the Complaint.

104.    Defendants deny the allegations of Paragraph 104 of the Complaint, and state that the documents attached as Exhibit 10, 13, and 14 speak for themselves.  Defendants deny any characterizations of those Exhibits that are inconsistent with their plain language.  Defendants deny that they have known, or have willfully blinded themselves to knowing, that any action on Defendants' part would result, could result, or has resulted in any of Saphena's customers infringing any valid patent of Plaintiff's.  Moreover, Defendants deny that they have in any way induced, encouraged, or facilitated infringement of any valid patent of Plaintiff's.

105.    Defendants the allegations of Paragraph 105 of the Complaint, and state that the document attached as Exhibit 9 speaks for itself.  Defendants deny any characterization of that Exhibit that is inconsistent with its plain language.  Defendants admit that the Venapax System is a surgical apparatus used in endoscopic vessel harvesting and has an elongated cannula.

106.    Defendants deny the allegations of Paragraph 106 of the Complaint, except admit that Dr. Chin is listed as an inventor on the '243 Patent and that he had knowledge of the '243 Patent.  Defendants admit that a copy of Exhibit 13 is attached to the Complaint.  The document attached as Exhibit 13 speaks for itself.  Defendants deny any characterization of that document that is inconsistent with its plain language.  Defendants admit that Dr. Chin and other physicians have used the Venapax device in California and elsewhere.

107.    Defendants deny the allegations of Paragraph 107 of the Complaint.

108.    Defendants deny the allegations of Paragraph 108 of the Complaint.

109.    Defendants deny the allegations of Paragraph 109, except admit that the Complaint seeks damages, a permanent injunction, and attorneys' fees and costs.  Defendants deny that Plaintiff is entitled to damages, a permanent injunction and/or attorneys' fees and costs.

## **CLAIM 4 – BREACH OF WRITTEN CONTRACT**

110.    Defendants repeat, reallege, and incorporate by reference their responses to the allegations of Paragraphs 1-109 of the Complaint as if fully set forth herein.

111.    Defendants deny the allegations of Paragraph 111 of the Complaint.

112.    Defendants deny the allegations of Paragraph 112 of the Complaint.

113.    Defendants deny the allegations of Paragraph 113 of the Complaint.

114.    Defendants deny the allegations of Paragraph 114 of the Complaint.

115.    Defendants deny the allegations of Paragraph 115 of the Complaint.

116.    Defendants deny the allegations of Paragraph 116 of the Complaint.

117.    Defendants deny the allegations of Paragraph 117 of the Complaint, except admit that Dr. Chin worked for companies ultimately acquired by Maquet, and thereafter for Maquet. Defendants admit that Dr. Chin co-founded Pavilion after leaving his employment with Maquet.

118.    Defendants deny the allegations of Paragraph 118 of the Complaint, except admit that on December 23, 2011, Pavilion filed the provisional application No. 61/580,107 with the USPTO. Defendants admit that on December 21, 2012, Pavilion filed the non-provisional application No. 13/723,676 with the USPTO.  Defendants admit that U.S. Patent No. 9,119,900 ("the '900 Patent") issued on September 1, 2015.  Defendants admit that Dr. Chin is listed as the sole inventor on both applications and the '900 Patent.  Defendants admit that Saphena is listed as the sole assignee on the '900 Patent.

119.    Defendants deny the allegations of Paragraph 119 of the Complaint, except admit that Dr. Chin delivered a lecture at the University of California San Francisco, which is publicly available at https://www.youtube.com/watch?v=D7TiB30GdQg.

120.    Defendants deny the allegations of Paragraph 120 of the Complaint.

121.    Defendants deny the allegations of Paragraph 121 of the Complaint.

122.    Defendants deny the allegations of Paragraph 122 of the Complaint, except admit that the Complaint seeks damages and injunctive relief.  Defendants deny that Plaintiff is entitled to damages and injunctive relief.

**Answer and Counterclaim of Defendants**          - 19 -          CASE NO. 3:16-CV-07213-WHA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CLAIM 5 – CORRECTION OF INVENTORSHIP OF PATENT

123.    Defendants repeat, reallege, and incorporate by reference their responses to the allegations of Paragraphs 1-122 of the Complaint as if fully set forth herein.

124.    Defendants deny that Dr. Chin is incorrectly listed as the inventor of the '900 Patent. Defendants are without information or knowledge sufficient to form a belief as to the truth of the remainder of the allegations of Paragraph 124 of the Complaint, and therefore deny those allegations.

125.    Defendants deny the allegations of Paragraph 125 of the Complaint.

## CLAIM 6 – FALSE ADVERTISING IN
## VIOLATION OF SECTION 43(A) OF THE LANHAM ACT

126.    Defendants repeat, reallege, and incorporate by reference their responses to the allegations of Paragraphs 1-125 of the Complaint as if fully set forth herein.

127.    Defendants deny the allegations of Paragraph 127 of the Complaint.

128.    Defendants deny the allegations of Paragraph 128 of the Complaint.

129.    Defendants deny the allegations of Paragraph 129 of the Complaint.  Defendants specifically deny that the claimed benefits of Venapax over older, legacy EVH systems are in any way deceptive, false, or misleading.  Maquet is aware, for example, of its own system's potential to cause thermal charring.  Maquet itself has promulgated instructions for use ("IFU") of its latest system, the Vasoview HemoPro 2; these instructions contain numerous warnings regarding the HemoPro 2 causing "thermal injury to tissue," routinely reaching temperatures in excess of 42 degrees Celsius (107.6 degrees Fahrenheit), and even becoming hot enough to ignite operating room supplies if not handled with due care.  *See* Ex. 1 at 5-6.  Maquet's IFU even instructs the user that it is necessary to periodically remove "char build up on the Jaws" of the HemoPro 2 device during an EVH procedure.  *Id*. at 9.  Similarly, Maquet is aware of the potential for the cannula of its legacy EVH devices to damage the vein during use: the IFU for the Vasoview 7 specifically warns users that "[t]o avoid damage to delicate tissue, advance the cannula gently."  Ex. 2, at 4.

130.    Defendants deny the allegations of Paragraph 130 of the Complaint.

131.    Defendants deny the allegations of Paragraph 131 of the Complaint, except admit that the Venapax System is sold in multiple states.

132.    Defendants deny the allegations of Paragraph 132 of the Complaint, except admit that the Venapax System competes directly with Maquet's EVH solutions.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

The Complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

Defendants' products do not infringe, and Defendants have neither induced nor contributed to the infringement of, any of U.S. Patent Nos. 5,916,233, 6,705,986, and 7,534,243.

### Third Affirmative Defense

The claims of U.S. Patent Nos. 5,916,233, 6,705,986, and 7,534,243 are invalid because they fail to satisfy the conditions for patentability stated in Title 35 of the United States Code, including, among other sections, §§ 101, 102, 103, and 112.

### Fourth Affirmative Defense

Maquet's claim for damages is limited by 35 U.S.C. §§ 286 and 287(a).

### Fifth Affirmative Defense

Maquet's claim for injunctive relief is barred because it has an adequate remedy at law; it is not being, and is not in danger of being, irreparably injured; the balance of the hardships is not in its favor; and the public interest is not served by the granting of injunctive relief.

### Sixth Affirmative Defense

Maquet's claims are barred by laches and/or equitable estoppel.

### Seventh Affirmative Defense

Maquet's claims are barred by the doctrine of prosecution history estoppel.  During prosecution of the patents in suit, Maquet or its patent agent or attorney made amendments, took positions, or made concessions statements or representations that estop Maquet from asserting the patents in suit against any product made, used, sold, or offered for sale by Saphena.

### Eighth Affirmative Defense

Maquet has misused the '233 Patent, the '986 Patent, and the '243 Patent by asserting these patents against Saphena in order to preclude, hamper, hinder, and delay Saphena from fairly

**Answer and Counterclaim of Defendants**       - 21 -       CASE NO. 3:16-CV-07213-WHA

competing against Maquet in the market.  Maquet's use of its patents in this matter as an attempt to block Saphena from competing fairly in the market constitutes a knowing, anticompetitive use of these patents.

Additional Defenses

Defendants reserve the right to assert additional defenses that may become known to them through discovery.

**COUNTERCLAIMS**

Defendants assert the following Counterclaims against Maquet, upon knowledge with respect to itself and its own acts, and upon information and belief with respect to all other matters:

**PARTIES**

1.     Counter-claimant Saphena Medical, Inc. ("Saphena") is an innovator in the field of endoscopic vessel harvesting ("EVH") products.  Founded in 2013, Saphena is a Delaware corporation with a principal place of business in West Bridgewater, Massachusetts.  Saphena sells its comprehensive EVH device, the Venapax EVH System, to hospitals, doctors and physicians' assistants across the United States.

2.     Counter-claimant Dr. Albert K. Chin ("Dr. Chin") is a prominent medical device inventor and a director at Saphena.  Dr. Chin is a resident of Palo Alto, California.

3.     Counter-defendant Maquet Cardiovascular, LLC ("Maquet") is a Delaware limited liability company with a principal place of business in Wayne, New Jersey.  Maquet has a second place of business in San Jose, California, where it conducts activities related to the Vasoview line of products, which compete with Saphena's Venapax product.  Maquet is engaged in selling its products, including the Vasoview product, to hospitals and groups of hospitals within the state of California.

**JURISDICTION AND VENUE**

4.     Certain of these Counterclaims arise under the patent laws of the United States, as enacted under Title 35 of the United States Code and the provisions of the Lanham Act, 15 U.S.C. § 1051, and the Sherman Act, 15 U.S.C. § 1 et seq.  This Court has subject matter jurisdiction over

these Counterclaims pursuant to 28 U.S.C. §§ 1331-1338 because these Counterclaims arise under the patent laws of the United States and under 15 U.S.C. §§ 1 et seq. and 1051.

5.    This Court has jurisdiction over the remainder of these Counterclaims because they arise from a common nexus of operative facts concerning Maquet, a Delaware company with a principal place of business in New Jersey, and Defendants, who either reside or have their principal place of business in California, and the amount in controversy exceeds $75,000.

6.    These Counterclaims arise out of the same transaction or occurrence that is the subject of Maquet's Complaint.  This Court has personal jurisdiction over Maquet because it submitted itself to the jurisdiction of this Court by filing its Complaint in this judicial district.  The acts committed by Maquet that are the basis of this action occurred in this judicial district.

7.    In its Complaint, Counter-defendant Maquet alleges that Counter-claimants have infringed, induced the infringement of, and contributed to the infringement of, United States Patent Nos. 5,916,233, 6,705,986, and 7,534,243.  Because Counter-claimants deny that they infringe, or that they have infringed or induced, or contributed to, the infringement of, any valid claim of any of those patents, an actual and justiciable controversy has arisen and now exists between Counter-claimants, on the one hand, and Maquet, on the other, as to whether Counter-claimants infringe any claim of any of those patents and as to whether claims of those patents are valid.

8.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events that give rise to these Counterclaims occurred in this district.

## BACKGROUND

### A.    Introduction

9.    This dispute is about competition – more particularly, Maquet's conduct when confronted with the marketplace's rapid and enthusiastic response to Saphena's ingeniously simple, effective and technologically superior product, the Venapax endoscopic vessel harvesting system.

10.    In February 2014, Maquet first approached Saphena, praising Saphena's product and inviting an executive-level meeting in order to explore a purchase of, or other business arrangement with, Saphena.  In August 2014, executives of the two companies met at Saphena's Massachusetts headquarters, but Maquet was not successful in striking the deal it was seeking.  On December 16,

2016, in an apparent attempt to acquire through litigation what it was unable to acquire through business negotiation, Maquet initiated this lawsuit. Maquet there claimed – 34 months after learning of Saphena's product firsthand – that Saphena is violating patents (which Maquet has never commercialized) that have been assigned by others (including Saphena founder Dr. Chin) to Maquet, and that Dr. Chin somehow is violating a number of employment contracts (with conflicting terms) that Dr. Chin entered into years ago with different companies that were eventually acquired by Maquet, and/or with Maquet itself.  On February 6, 2017, Maquet amended its Complaint and instituted additional claims.  Saphena responds herein.

11.    Saphena is a small, innovative start-up company founded in 2013 by a seasoned medical device company operator and one of the industry's legendary figures.  It is headquartered in West Bridgewater, Massachusetts.  Saphena designs, manufactures and sells a single product, Venapax.  Venapax is manufactured and assembled in the United States.

12.    Maquet is not a product innovator.  It has existed in one form or another since the 1830's, and today is a sprawling and cumbersome aggregation of formerly unrelated businesses, some ancient by medical device standards, others more modern – each of which has been absorbed and assimilated into some part of Maquet's bureaucracy of affiliates, divisions, LLCs and foreign and domestic entities throughout the world.

13.    Maquet today controls approximately 85% of the market for the products that the parties sell in competition with each other.  Maquet maintains its dominant market position through a variety of tactics.  None of them are commendable.  Maquet targets and acquires smaller, more innovative companies, at times after litigating or threatening litigation with the reluctant acquisition target.  Maquet thereafter discontinues the acquired company's product (thereby eliminating it as competition), or begins selling the acquired company's product or a form thereof for itself (thereby eliminating it as competition).  Maquet today maintains unnaturally high unit sales for otherwise inferior products through massive product bundling contracts with hospitals, industry affiliated purchasing groups and others that offer steep discounts and generous rebates from Maquet for compliance, and threaten sharp financial penalties and massively punitive price increases against hospitals and others who defy Maquet's terms (for instance, by purchasing products from Maquet

competitors, and thus failing to satisfy the steep total product percentage requirements of certain Maquet bundling contracts).

14.     Saphena's contracts with its customers contain no such terms.  The only reason that exists for a hospital to buy Saphena's Venapax is because the hospital believes it offers a better solution for the hospital and the patients in its care.

15.     Venapax's elegant, unitary design enables surgical technicians to easily visualize and dissect the vessel intended for harvesting, and to quickly and effectively ligate and cauterize vessel branches without the smoke, char, excessive heat, or thermal spread typical of competing devices. Vessel harvesting with Saphena's Venapax is accomplished without grabbing, twisting, pulling, torqueing or otherwise manipulating the vessel – and therefore without resulting vessel graft trauma – unlike as is required with Maquet's competing device. As a result, endoscopic vein harvesting ("EVH") with Saphena's product is typically quicker, and is accomplished without the need to introduce multiple additional or substitute tools into the patient.  EVH with Venapax is designed to produce a healthy, high-quality graft without trauma to the vessel or patient.

16.     Saphena's Venapax is sold as a sterile, disposable, single use device at a fraction of the price of Maquet's competing, recall-prone system.  In sum, there is no obviously apparent reason that customers of the parties' products, at liberty to exercise their free and natural preferences, will continue to purchase Maquet's more expensive and less desirable product.  Maquet's lawsuit is a powerful indication that it has reached this same conclusion.

**B.     Endoscopic Vessel Harvesting (EVH)**

17.     EVH is a surgical procedure by which a blood vessel (typically the greater saphenous vein in the leg) can be removed from the patient's leg or arm, using minimally invasive instruments, for later use in a coronary artery bypass graft.  EVH is now the primary method in this country for harvesting vessels for use in coronary artery bypass surgery.

18.     Earlier, "open" methods of vessel harvesting ("OVH") resulted in substantial physical trauma to the harvested vein and, at times, the patient.  In OVH procedures, the surgeon must make a very long incision running nearly the entire length of the patient's leg – one of the largest incisions necessitated by any surgical procedure – in order to harvest the vessel.  The target blood vessel,

which is encased in tissue, must then be cut free.   As a result, the OVH procedure is associated with a high risk of wound complications, including pain, hematoma, cellulitis, edema, and other conditions that delay wound healing.  In fact, studies have shown that as many as 37% of patients who undergo the traditional OVH procedure develop wound complications at the incision site.  *See* Ex. 3, Davis et al., Endoscopic vein harvest for coronary artery bypass grafting: technique and outcomes, *J Thorac. Cardiovasc. Surg.* 1998;116:228-235.

19.     EVH, by contrast, is a minimally-invasive procedure.  A small incision, no larger than 2 centimeters, is made near the knee.  A specialized EVH tool is then inserted through this incision.  Using such tool, the vessel to be harvested, or "conduit," is carefully disconnected from the smaller blood vessels branching off from it, which are then sealed by cauterization.  The conduit can then be removed and the incision closed.

20.     Compared to OVH, EVH procedures produce dramatically improved patient outcomes, preventing the vast majority of patients from suffering complications, such as increased risk of infection, postoperative pain and swelling, and scarring.  In addition, EVH produces a healthier conduit – which is key to the success of the coronary artery bypass graft.

**C.     Dr. Chin**

21.     Dr. Chin (often referred to as "the godfather of EVH") is an inventor, engineer, and trained surgeon, who has worked in the conception and development of surgical instruments, including EVH tools, for more than 20 years.  Dr. Chin has co-founded several innovative medical device companies, has been named an inventor on 198 issued U.S. patents, and has been responsible for marketed products totaling over $2 billion in revenue.  Over a million endovein procedures have been performed using Dr. Chin's inventions.

22.     Dr. Chin holds a B.S. in Mechanical Engineering from MIT, an M.S. in Mechanical Engineering from Stanford University, and an M.D. from the University of California San Francisco School of Medicine.

23.     In 1989, Dr. Chin co-founded Origin MedSystems, Inc., which was later acquired by Eli Lilly and Company, and spun out as Guidant Corporation ("Guidant") (where Dr. Chin spent 20

**Answer and Counterclaim of Defendants**     - 26 -     CASE NO. 3:16-CV-07213-WHA

years of his career).  During that time, Dr. Chin designed numerous surgical and intravascular instruments, including the original Vasoview device developed by Guidant in 1995.

24.      In 2008, Guidant was acquired by Maquet, and Dr. Chin was named Chief Innovation Officer of Maquet.

25.      Dr. Chin left Maquet in 2009, and founded Pavilion Medical Innovations, LLC, an incubator for innovative medical device companies.  One of those companies – founded in 2013 by Dr. Chin and Mike Glennon – is Saphena.

**D.      Saphena**

26.      Saphena is a young, vigorous company formed with the purpose of providing a superior EVH solution for the market.  Venapax – the name of which is derived from the Latin for "vein" and the Greek for "once and for all" – delivers on that promise.  Designed in consultation with Saphena's customers, it addresses well-known needs in the EVH space, and boasts a comprehensive, integrated, and efficient design.  Many physicians' assistants experienced with EVH procedures have provided Saphena with feedback indicating that their use of Venapax greatly improves vessel graft quality over other previously-used methods.

27.      Saphena's Venapax fills a long-felt void in the EVH market precisely because the market drove Venapax's development.  For years, physicians' assistants across the country (the customers who use EVH devices) had been voicing the need for a unitary, comprehensive EVH device.

28.      The EVH market had also voiced concern about challenges with current EVH methods and devices, like char and lateral thermal spread (*i.e.*, unintended damage to surrounding cells).  Such challenges were well known in the industry.  *See* Ex. 4, *Optimizing Conduit Quality in CABG Surgery Helps Improve Patient Outcomes*, Maquet Getinge Group (Nov. 2011).  Yet, despite these concerns, for many years no innovative products were being introduced into the market.

29.      Motivated by customer and patient needs, Saphena's CEO Mike Glennon and COO Mark Orphanos worked side-by-side with customers in the EVH space to identify what those customers needed from a next-generation EVH device.  In addition, Mr. Glennon and Mr. Orphanos studied the publicly-available literature and analyzed what the courses at the time were teaching

users.  Saphena's goal was to invent a new EVH system that focused on the quality of the conduit, was based on established science and sound engineering, and incorporated customer input into the design.

30.     What Mr. Glennon and Mr. Orphanos had learned from their discussions with Saphena's customers was that dominant market players like Maquet were essentially running on autopilot.  Maquet was not seeking innovative solutions for its customers – not even for the very challenges Maquet itself had identified.  *See* Ex. 4, *Optimizing Conduit Quality in CABG Surgery Helps Improve Patient Outcomes*, Maquet Getinge Group (Nov. 2011).  In fact, Maquet barely focused on its own customers at all.  Many had not even *seen* a Maquet sales rep for several years.

31.     Maquet alternated between benign neglect and engaging with its customers solely for the purposes of training them how *not* to use Maquet's devices.  For example, for several years, Maquet paid a proctor to teach – and paid the expenses of customers who attended – a monthly "advanced techniques" course that directly contradicted Maquet's own instructions for using their EVH devices.  Specifically, the proctor instructed users not to inflate the BTT balloon, notwithstanding the explicit steps listed in the instructions for use, because balloon inflation can lead to vein stasis and fibrin clot.  The proctor also instructed users how *not* to use the C-ring to manipulate the vein, because tension on the conduit decreases graft quality.  During that course, the proctor would intentionally demonstrate to potential customers – using two scopes, one inserted in each direction – how using Maquet's devices in their intended way would put abnormal stress and tension on the vein and branches.

32.     To its customers, Maquet seemed more concerned with minimizing the damage its device could cause and far less concerned with the state of innovation in the EVH space.

33.     Saphena's philosophy was different.  Saphena poured its time and energy into creating the innovative, new EVH platform that the market craved.  Saphena designed a product that adapted to its customers, not the other way around.  That product was Venapax.

34.     Manufactured and assembled in the United States, the Venapax device reflects critical customer input and innovation.  Conceived of and designed by Saphena COO Mark Orphanos and Michael Barenboym of the Baren-Boym Company, Venapax is as close to a no-touch procedure as

**Answer and Counterclaim of Defendants**      - 28 -      Case No. 3:16-cv-07213-WHA

the EVH market has ever seen in a field that widely recognizes that no-touch techniques result in higher graft patency and graft quality.  *See, e.g.*, Ex. 5, Mannion et al., *"No-Touch" Versus "Endo" Vein Harvest: Early Patency on Symptom-Directed Catheterization and Harvest Site Complications*, (Dec. 2013).

35.     Venapax (shown below) is a comprehensive, single device integrated in several ways: its dissection cone does not require attachment and detachment, its design allows cautery electrodes to be extended, rotated, and retracted, and its power cord is integrated to permit swift setup and disposal.  As a result, the Venapax only requires the user to make a single insertion in the leg, thereby greatly reducing the patient's risk of infection.



36.     Venapax's fully-integrated, unitary device is substantially different in both appearance and operation from the EVH systems that previously existed on the market.  To begin with, those pre-existing systems (such as the Maquet system shown below) require multiple components – *e.g.*, a separate, removable dissection tip and separate, insertable bisector – that require users to repeatedly insert and remove the device from the patient's leg or arm in order to change the tip and insert the bisector after dissection has been completed so that ligation and cauterization may then be performed. Such repeated insertion and removal of the device into the patient's incision leads to an increased risk of infection for the patient.

37.     In addition, such cumbersome systems typically have higher learning curves for use. For example, inexperienced users of such systems may have to perform more than a hundred EVH procedures with such systems before becoming skilled at endoscopic vein harvesting. Using the Venapax, however, an inexperienced user may only have to perform three to five cases before establishing confidence and comfort with the procedure.

38.     In Venapax, Saphena has also created a much-needed solution for vessel cauterization, which in turn optimizes vessel quality.  Venapax employs bipolar electrocautery, which when combined with its end effectors results in an efficient energy delivery system that is superior to other technologies.  Saphena's end effectors focus electrical energy in a high-density current pathway in a "smart" cautery system.  Unlike competing systems, Venapax's bipolar cautery elevates tissue temperature only where electricity flows.  Venapax's high-density current pathway desiccates the tissue, monitors desiccation progress in real-time, and forms the tissue weld in the most effective way by adjusting energy delivery depending on the characteristics of the tissue being desiccated.  As a result, the Venapax is designed to have a low temperature rise, produce minimal smoke, significantly minimize lateral thermal spread and char, and yield strong tissue weld burst strengths.

39.     According to feedback received by Saphena from several physicians' assistants in the field who use the Venapax device, use of Venapax yields an observable difference in vessel quality.  Venapax's smooth design allows for gentle dissection and ligation, and minimizes vessel entanglement with the device.  Users describe a Venapax-harvested vessel as "alive" and "healthy," which allows patients to receive vessels that are closest to their original condition.  Venapax-

**Answer and Counterclaim of Defendants**          - 30 -          CASE NO. 3:16-CV-07213-WHA

harvested vessels (as shown on the left in the picture below) are not treated as harshly as the overly-torqued and irritated vessels harvested by other devices (as shown on the right below).  And, as the picture on the left further demonstrates, while clips and ties should always be used before grafting the vein onto the heart, because veins harvested using the Venapax device are cauterized and sealed by the device, no clips or ties are necessary to prevent leakage of saline during preparation of the vein for use in coronary artery bypass grafting.



40.     Moreover, the benefits to the vein are not merely aesthetic.  As recognized by Maquet's own white papers, graft failure can be caused by electrocautery-induced thermal spread. *See* Ex. 6, Bershinsky et al, *Endoscopic Vessel Harvesting: Using Advancements and Best Practices to Enhance Conduit Quality*, at 2 (2000).

41.     In sum, Venapax offers a design that cannot pick up or torque the conduit, but can take branches much farther away from the main conduit.  In addition, it incorporates an effector design that produces minimal smoke, char, heat and thermal spread. The result should be a better conduit, which should result in less bleeding – all from one elegant unitary device.

**Answer and Counterclaim of Defendants**          - 31 -          CASE NO. 3:16-CV-07213-WHA

42. Not surprisingly, as a result of Saphena's critical innovations over existing technology, Saphena's Venapax product presents a clear market threat to earlier, established EVH devices, like those sold by Maquet.

**E.     Maquet's Vasoview EVH Systems**

43. Maquet is a multinational industry giant in the field of surgical equipment, and has been in operation for over 175 years. Maquet is based in Rastatt, Germany, and has several production facilities outside of the United States. Maquet is part of the massive global conglomerate Getinge Group, which markets medical equipment and systems worldwide, and which took in over $3.3 billion in revenue in 2016 alone. Getinge Group has more than 15,000 employees in 40 countries all over the world. Maquet, unlike Saphena, has consistently failed to invest in advancements to its EVH offerings.

44. Maquet acquired the original Vasoview product when it purchased assets of Guidant Cardiac Surgery in 2008. The original Vasoview had been developed with the customer in mind, not the patient. With the original Vasoview, Guidant's primary focus had been on ease of use rather than the quality of the harvested conduit. As a result, the Vasoview system was not optimized for dissection, branch ligation or vein extraction. Rather, it was created to enable the user to get the vein out more quickly through a small incision. Specifically, the Guidant orbital dissector made it easier to pick up and manipulate the conduit and to line up the effector for branch ligation. Those effectors were purchased from other manufacturers who had already completed the FDA clearance process, and were chosen simply because they could fit through the appropriate channel in Guidant orbital dissector.

45. Few fundamental changes have been made in Maquet's Vasoview product since then. When Maquet has unveiled "new" iterations of its product – *e.g.*, the Vasoview 6 Pro, Vasoview 7, HemoPro and HemoPro 2 – those iterations typically have consisted of pairing Maquet's product with off-the-shelf components purchased from other Original Equipment Manufacturers ("OEMs"). For example, the last update Maquet made to its Vasoview line – *i.e.*, the HemoPro 2 iteration launched in 2010 – simply combines the existing Vasoview device acquired from Guidant with a dissector tip built by Starion Instruments.

**Answer and Counterclaim of Defendants**      - 32 -      CASE NO. 3:16-CV-07213-WHA

46.     As a result of this failure to innovate, Maquet's Vasoview product continues to suffer from a number of correctable flaws, including thermal charring at the cauterization sites, potential occlusion of the vein caused by inflating the balloon and sealing of the incision, and a C-ring design that can become entangled in the saphenous vein, damaging or stressing the vein by torqueing or twisting it.

47.     For example, Maquet's Vasoview devices with HemoPro use direct current to achieve cautery.  The HemoPro cautery element was purchased from Starion instruments.  Resistive heating elements heat wires that then transfer heat to the tissue, and deliver identical energy pulses regardless of target tissue characteristics.  Such resistive heating elements are more likely to cause potentially damaging heat application, increased char, and smoke.  Yet, despite awareness of the risk of thermal charring caused by its HemoPro devices, Maquet has never created an adequate solution for vessel cauterization.

48.     Maquet also implemented a Bi-Sector purchased from Gyrus (now Gyrus AMCI, Inc., part of Olympic Surgical Technologies America) that uses bipolar energy.  That Bi-Sector uses low density current pathways (as opposed to the high density current pathways used by Saphena's Venapax.)  Maquet's customers' dissatisfaction with the resulting heat, char and smoke with HemoPro remain.  In fact, some Maquet customers have reported that after only five minutes of use "and having only cut a few branches," the HemoPro 1 became so hot that the device was "glowing red and smoking."  *See* Ex. 7.   Other customers have noted that during EVH procedures, the tip of the HemoPro's jaw can become "hot and smoking" and "the silicone on the tips of the jaws was melted."  *Id.*  During at least one procedure, a patient apparently "suffered an external burn" from the HemoPro 1 device.  *Id.*  Some Maquet customers have even indicated that the HemoPro 1 can catch fire.  *Id.*  Because of these or other defects, several lot numbers of the HemoPro 1 were the subject of an FDA recall from October 2013 to April 2015, in addition to a separate recall from December 2009 to September 2011.  *See* Exs. 8-9.

49.     That 2013 recall was neither the first, nor the last recall of Maquet's HemoPro devices.  In 2010, Maquet had received numerous customer complaints and Medical Device Reports (MDRs)

indicating that the HemoPro 1 (VH-3000) could inadvertently turn on, requiring the device's removal from the surgical field.  *See* Ex. 10, *Vasoview HemoPro2 510(k) Submission*, at 2 (June 11, 2010).

50.     Faults in the HemoPro have forced Maquet to very recently issue an "urgent product removal" of Vasoview Hemopro VH-3500 (this time, because the device's power supply exhibits failure mode of intermittent or no power when the device is on).  *See* Ex. 11.  In total, Maquet's products have been the subject of no fewer than 45 separate recalls between 2009 and 2014.  *See* Ex. 12, FDA News Release: Federal judge approves consent decree with Maquet Holding B.V. & Co., at 2.

51.     Despite these issues, both the HemoPro 1 and HemoPro 2 remain on the market.

**F.      Maquet's False and Misleading Statements**

52.     Maquet continues to make numerous inaccurate or misleading statements in its advertising and promotional materials for these devices in order to entice customers to purchase its Vasoview products over competing EVH solutions.  These statements directly contradict the readily-observable facts about the Vasoview systems' failings documented both by Maquet and by its customers who have witnessed the alarming, undesirable, and even dangerous real-world performance of these devices.

**1.      Elimination of Thermal Spread**

53.     For example, in Maquet's press release regarding the launch of its Vasoview HemoPro 2, Maquet advertised that the system can "reduce thermal spread and . . . achieve optimal conduit quality" for subsequent use in coronary bypass surgery.  *See* Ex. 13.

54.     On its website, Maquet goes even further, asserting that the HemoPro 2 "virtually eliminates thermal spread."  *See* Ex. 14.

55.     Eliminating thermal spread is of vital importance in EVH procedures for the successful harvesting of healthy graft material.  Thermal spread during cauterization can damage the endothelial cells of the vessel being harvested: excessive endothelial damage, caused by excessive thermal spread, can in turn lead to the failure of the graft when it is used in the patient's coronary artery bypass.  *See* Ex. 6, Bershinsky et al, *Endoscopic Vessel Harvesting: Using Advancements and Best Practices to Enhance Conduit Quality*, at 2.

**Answer and Counterclaim of Defendants**          - 34 -          CASE NO. 3:16-CV-07213-WHA

56.     Such irreversible thermal damage can occur at temperatures as low as forty-four degrees Celsius (44° C), if the vessel is exposed to that temperature for prolonged periods of time.



Figure 4.1. Threshold temperature and time for irreversible thermal damage

57.     Maquet's own instructions for use ("IFU") of its latest system, the Vasoview HemoPro 2, demonstrate that Maquet knows, and cautions medical proceduralists, that the Vasoview HemoPro 2 does not eliminate thermal spread, "virtually" or otherwise.  Maquet's advertising statements to the contrary are false, inaccurate, or otherwise unlawfully misleading.  For example, Maquet's instructions contain numerous warnings that the HemoPro 2  if not used in strict accordance with the instructions, will cause "thermal injury to tissue," routinely reaching temperatures in excess of 42 degrees Celsius (107.6 degrees Fahrenheit) and even becoming hot enough to ignite operating room supplies if not handled with the necessary level of caution.  *See* Ex. 1, at 5-6.  Similarly, Maquet's own training documents for use of the HemoPro 2 reveal that, Maquet can, at best, claim "zero thermal spread" only  "*outside of the concave side* of the Jaws when used per the IFU."  *See* Ex. 15, Fig. 1.  Maquet thus acknowledges that thermal spread exists within the concave side of the device, and to an even greater degree on the convex side.  Therefore, even when used precisely in accordance with Maquet's IFU, thermal spread is not "virtually eliminated" by the HemoPro 2, as Maquet falsely claims in its advertising.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

58.     As shown below, Maquet's own training materials  describe the existence of thermal spread caused by the HemoPro 2, and also graphically depict the device – when properly used in accordance with Maquet's direction - causing thermal injury on both sides of the tissue weld during normal use.



59.     Further, as shown below, excessive smoke produced during EVH procedures accomplished with Maquet's device demonstrates the extent of the thermal charring casued by the device even in normal operation.  A device that "virtually eliminates thermal spread" simply would not create large quantities of smoke during an ordinary EVH procedure.



60.    In contrast, Saphena's Venapax device produces markedly less smoke during the same procedure (as shown below), one of the many indicators that Saphena's device is designed to effectively minimize thermal spread and any resulting injury to tissue.



61.    The thermal charring that a Maquet device can cause appears as blackened areas on the harvested conduit.  As shown below, the tissue damage caused by Maquet's device is readily apparent.



Harvested Vein with conventional EVH system

### 2.  Simultaneous Cut and Seal Technology

62.  Maquet's website also claims that the HemoPro 2 offers "simultaneous cut-and-seal technology" for EVH.  This too is false.  Maquet's misleading advertising leads customers to believe that the HemoPro 2 is capable of bisecting and cauterizing a branching blood vessel in a single step. A product with single-step cut-and-seal capability is desirable, because cutting and sealing branches simultaneously is associated with reduced thermal spread, and thus reduced endothelial cell damage to the conduit being harvested.  *See* Ex. 6, Bershinsky et al, *Endoscopic Vessel Harvesting: Using Advancements and Best Practices to Enhance Conduit Quality*, at 2.

63.  Contrary to Maquet's advertisements, however, Maquet's own training materials for the HemoPro 2 instead prescribe a *five*-step method for branch division and sealing, which Maquet refers to as the "CLAMP method."  *See* Ex. 15, Vasoview HemoPro 2 New Features and Technique Overview, at 2.  In the training manual for the HemoPro system, Maquet elaborates on this method, describing it as a multi-step process for cutting and sealing branches, and a process which may require *several attempts* if a portion of the branch vessel remains uncut.  *See* Ex. 16, Training Manual: Vasoview HemoPro Endoscopic Vessel Harvesting System, at 19-20.  As shown below, Maquet's own training materials, therefore, belie its assertion that branch dissection using a Maquet device is a single-step process.

■ Use the C-Ring Slider to advance the C-Ring and cradle the vein. (Figure 29) Using the incision as the point of reference, moving distal to proximal, retract the Harvesting Cannula down the tunnel. **Always maintain correct orientation of the camera.**

■ Once a branch is encountered, keep the C-Ring distal to the branch and advance the VASOVIEW HEMOPRO Harvesting Tool into the tunnel and into the visual field. Open the Jaws of the Harvesting Tool to engage the vessel branch by moving the Activation Toggle on the Harvesting Tool Handle to the forward most position. (Figures 30 and 31)

■ Always position the Harvesting Tool Jaws on the vessel branch with the concave side of the Jaws toward the main vessel. (Figure 31)

■ Secure the branch by closing the Jaws. This is performed by pulling back on the Activation Toggle until mild resistence is met. (Figures 32 and 33)

■ Apply energy by pulling the Activation Toggle back from the center position until a stop is noticed. (Figure 34) Apply mild tension to the vessel branch during device activation by retracting or slightly rotating the jaws to aid branch transection.

■ When separation of the branch tissue is noticed, open the Jaws.

■ If cutting is incomplete, reapply the Jaws to the vessel branch. Repeat Jaw Activation to the portion of the branch which is not transected.

■ Close the Jaws prior to retracting the Harvesting Tool into the Harvesting Cannula to avoid damage to the device.



Figure 29          Figure 30          Figure 31

Figure 32          Figure 33          Figure 34

64.     Maquet's false and misleading advertisements have deceived, or are likely to deceive, customers regarding the capabilities of Maquet's EVH solutions.

65.     As a direct competitor of Maquet, and as the provider of a revolutionary EVH solution which can both minimize thermal spread and cut and seal branches in a single step, Saphena has been and continues to be harmed by this deceptive advertising.

G.     **Maquet's Pattern of Anti-Competitive Behavior**

66.     Rather than innovate on its own, the *modus operandi* of Maquet's parent company, Getinge, is to purchase companies doing actual innovative work in order to eliminate competition in the marketplace.  For example, Maquet purchased the cardiac and vascular divisions of Boston Scientific Corporation, including Guidant's EVH business, in January 2008.  Less than a year later, Getinge sought to acquire another EVH product line through an acquisition of rival Datascope

**Answer and Counterclaim of Defendants**          - 39 -          CASE NO. 3:16-CV-07213-WHA

Corporation.  The Federal Trade Commission precluded Getinge from acquiring Datascope's EVH product line, finding that such an acquisition would give Getinge a near-monopoly share (approximately 90%) of the EVH device market, which would in turn lead to price increase and a decrease in innovation.

67.     34 months prior to the initiation of this lawsuit, Maquet similarly made overtures to Saphena about a potential acquisition.  Specifically, in August of 2014, Maquet's Vice President of Marketing and Business Management (Michael McCartin), then-Senior Vice President – North America (Philip Freed), and then-President and CEO, Cardiac Systems (Peter Hinchliffe) met with Saphena's leadership for a demonstration of Venapax's capabilities (which took place under a non-disclosure agreement executed by Maquet and Saphena).

68.     During this meeting, Saphena conducted a demonstration of the Venapax System's features and benefits, showed a video of the Venapax System in action, allowed Maquet personnel to test-drive the Venapax System in a simulated procedure, and discussed costs, manufacturing, and marketing considerations.  During these discussions, Maquet indicated that it was "very impressed" and "very intrigued" with the Venapax System; however, no further acquisition discussions were had between the parties after that meeting.

69.     Maquet is now pursuing this lawsuit – 34 months after seeing Saphena's Venapax System – as an apparent means to drive down Saphena's acquisition price, or failing that, to drive Saphena entirely out of the market.  Maquet recognizes that Saphena's product is innovative and provides concrete benefits to providers and patients alike.  Instead of attempting to compete with Saphena fairly, however, Maquet has instead chosen to use its market power and legal resources to keep Saphena's product out of customers' hands.

70.     This is consistent with Maquet's overall approach to blocking competition in the marketplace.  For example, Maquet consistently acts to restrict healthy competition in the EVH space by locking its customers – primarily large groups of hospitals – into sole source contracts with Maquet.  These Maquet agreements (like the Maquet Choice Agreement), by their terms, require their customers to purchase 100% of their EVH products from Maquet for as much as a four-year term in order to receive Maquet discounts and/or rebates.  If the 100% commitment is achieved in a given

**Answer and Counterclaim of Defendants**        - 40 -        Case No. 3:16-cv-07213-WHA

quarter, Maquet customers can purchase Maquet's Vasoview 6 EVH System (VH-2000), which has a list price of $1032.81, for as little as $650.  The Vasoview HemoPro EVH System (VH-3000), which has a list price of $1307.88 may be purchased for as low as $950.  The Vasoview HemoPro 2 EVH system (VH-4000), which has a list price of $1500, may also be purchased for $950, assuming the 100% commitment requirement is met.  In effect, through these agreements, Maquet contractually obligates its customers not to purchase, or even conduct trials of, competitors' products.

71.     Such discounts are even further amplified when those devices are bundled with other accessories (*e.g.*, power supplies and endoscopes), a common Maquet tactic.  For example, Maquet has offered promotions to new and renewing customers whereby, with an initial purchase of five Vasoview HemoPro EVH Systems (VH-3000), a customer can receive two Vasoview HemoPro Power Supplies (listed at $5883.56 each) and six 7mm endoscopes (listed at $3477.30 each) at *no additional charge* – a value of $32,630 purchased for only $4,750.

72.     Through such promotions and bundling arrangements, Maquet is selling these products to customers below its fully allocated cost.  Maquet's sales and service unit ("SSU") in the United States purchases Maquet's Vasoview EVH systems from its corporate parent for a cost of up to $750.  Therefore, Maquet must sell its Vasoview EVH systems at above $750 in order to realize any margin.  However, when a customer can purchase five Vasoview HemoPro EVH Systems (VH-3000), two Vasoview HemoPro Power Supplies, and six 7mm endoscopes for a total of $4750, common sense dictates that each Vasoview HemoPro System (VH-3000) is being sold for less than $750.  More specifically, each of the thirteen products in that bundle are being sold for an average of $365.38.

73.     In addition to such discount programs, Maquet also offers its customers 5%-6% incentive rebates for maintaining their exclusivity with Maquet.  For example, if a customer maintains its 100% commitment with respect to EVH products as well as other Maquet products (beating heart, intra-aortic balloons, proximal seals, etc.), for a certain period (often 36 months), that customer can receive an additional rebate of up to 6% of its overall spend. Such rebates are calculated based on total sales, less returns, discounts and administration fees.

74.     Maquet also pays Capital Equipment Rebates.  Pursuant to that program, for annual Capital Product Purchase spend that exceeds $100,000, the customer can receive a rebate of 2% on

**Answer and Counterclaim of Defendants**          - 41 -          Case No. 3:16-cv-07213-WHA

incremental growth.  For Capital Product Purchase spend that exceeds $500,000, the customer can receive a 4% rebate on incremental growth.

75.     Maquet also pays additional Growth Rebates.  During a 48-month term, those Growth Rebates allow the customer to receive an additional 2.5% rebate for disposable spend that exceeds $550,000 annually; or an additional rebate of 5% if disposable spend exceeds $700,000 annually.

76.     In short, the bigger the customer, the bigger the spend, the bigger the rebate Maquet provides them.

77.     Notably, according to Maquet's President of Sales, Raoul Quintero, purchasing organizations comprised of thousands of hospital members make up nearly 70 percent of Maquet's current revenues.  *See* Ex. 17, at 2.  Therefore, by engineering barriers between Saphena and those potential customers, Maquet has been able to prevent innovative new products, like Saphena's Venapax, from reaching customers eager to purchase it.  These sole source, 100% commitment contracts between Maquet and its customers also dramatically raise prices on every participating member hospital if even one member hospital purchases a competing product from another company.

78.     Such arrangements have directly injured Saphena.  For example, as recently as January 2017, Saphena's attempt to outline the clinical advantages of the Venapax to physician's assistants at a potential customer in Georgia was denied – despite the customer's specific request to the contrary – on the basis of an agreement they already had in place which bundled Maquet EVH products with other Maquet products used in non-EVH procedures.  Even though the potential customer was receptive to the idea that the features of the Venapax could have clinical advantages for their patients, the decision not to even try Venapax was nonetheless made, because the customer believed that purchasing any Venapax devices could result in both a loss of rebates associated with their agreement and substantial increases in their purchase of other Maquet products (not just EVH devices), not only for them, but other hospitals on the agreement as well.

79.     Similarly, another large group of hospitals, whose members include several California hospitals, recently informed Saphena that they could only use EVH equipment that is already part of its fixed, bundled cardiac artery bypass grafting payment system – *i.e.*, EVH equipment sold to them by Maquet.

**Answer and Counterclaim of Defendants**          - 42 -          CASE NO. 3:16-CV-07213-WHA

80.     Several other large groups of hospitals that have entered into Maquet Choice Agreements, or similar 100% commitment agreements with Maquet, and/or that have benefitted from promotions such as the one described in Paragraph 62, also have member hospitals in California.

81.     Maquet also requires hospitals in Massachusetts to enter into the Maquet Choice Agreement or similar sole source or 100% commitment agreements.  Maquet has likewise offered discounts, rebates, below-cost pricing, and giveaways similar to those discussed above to customers in Massachusetts.

## FIRST COUNTERCLAIM
### (Below-Cost Sales in Violation of California Bus. & Prof. Code § 17043)

82.     The allegations contained in Paragraphs 1-81 above are incorporated herein by reference.

83.     Maquet sells or offers to sell its EVH products, including the Vasoview line of products, to hospitals (both individually and as part of large groups) within the state of California, at deeply discounted prices depending on the customer's level of commitment.

84.     Some Maquet customer agreements require customers to purchase 100% of their EVH products from Maquet for as much as a four-year term in order to receive substantial Maquet discounts and/or rebates.  If the 100% commitment is achieved in a given quarter, Maquet customers can purchase Maquet's Vasoview 6 EVH System (VH-2000), which has a list price of $1032.81, for as little as $650.  The Vasoview HemoPro EVH System (VH-3000), which has a list price of $1307.88 may be purchased for as low as $950.  The Vasoview HemoPro 2 EVH system (VH-4000), which has a list price of $1500, may also be purchased for $950, assuming the 100% commitment requirement is met.

85.     Maquet has offered promotions to new and renewing customers whereby, with an initial purchase of five Vasoview HemoPro EVH Systems (VH-3000), a customer can receive two Vasoview HemoPro Power Supplies (listed at $5883.56 each) and six 7mm endoscopes (listed at $3477.30 each) at no additional charge – a value of $32,630 purchased for only $4,750.

86.     Maquet's sales and service unit ("SSU") in the United States purchases Maquet's Vasoview EVH systems from its corporate parent for a cost of up to $750.  Therefore, Maquet must

sell its Vasoview EVH systems at above $750 in order to realize any margin.  However, as such promotions clearly demonstrate, Maquet is selling these products to customers below its fully allocated cost.

87.     In addition to such discount programs, Maquet also offers its customers 5%-6% incentive rebates for maintaining their exclusivity with Maquet.  For example, if a customer maintains its 100% commitment with respect to EVH products as well as other Maquet products (beating heart, intra-aortic balloons, proximal seals, etc.), for a certain period (often 36 months), that customer can receive an additional rebate of up to 6% of its overall spend. Such rebates are calculated based on total sales, less returns, discounts and administration fees.  Maquet also pays Capital Equipment Rebates.  Pursuant to that program, for annual Capital Product Purchase spend that exceeds $100,000, the customer can receive a rebate of 2% on incremental growth.  For Capital Product Purchase spend that exceeds $500,000, the customer can receive a 4% rebate on incremental growth. Maquet also pays additional Growth Rebates.  During a 48-month term, those Growth Rebates allow the customer to receive an additional 2.5% rebate for disposable spend that exceeds $550,000 annually; or an additional rebate of 5% if disposable spend exceeds $700,000 annually.

88.     Based on this information concerning the heavily discounted prices at which Maquet has offered to sell its Vasoview products to California customers, as well as Saphena's own experience in the industry, and publicly available industry information regarding Maquet's business model, Saphena alleges that Maquet has offered and sold its EVH Vasoview products below its fully allocated costs of producing and distributing those products.

89.     Through the above conduct, Maquet has engaged in predatory pricing, in violation of California Business & Professional Code § 17043.

90.     Counter-claimants have been damaged and irreparably injured by Maquet's unlawful pricing scheme, and will continue to be unless this Court enjoins Maquet from making further unlawful below-cost sales.  As recently as January 2017, Saphena's attempt to outline the clinical advantages of the Venapax to physician's assistants at a potential customer in Georgia was denied – despite the customer's specific request to the contrary – on the basis of the agreement they already had in place, which bundled Maquet EVH products with other Maquet products used in non-EVH

procedures.  Even though the potential customer was receptive to the idea that the features of the Venapax could have clinical advantages for their patients, the decision not to even try Venapax was nonetheless made because the customer believed that purchasing any Venapax devices could result in both a loss of rebates associated with their agreement and substantial increases in their purchase of other Maquet products (not just EVH devices), not only for them, but other hospitals on the agreement as well.  Similarly, another large group of hospitals, whose members include several California hospitals, recently informed Saphena that they could only use EVH equipment that is already part of its fixed, bundled cardiac artery bypass grafting payment system – *i.e.*, EVH equipment sold to them by Maquet.

91.    Maquet's predatory pricing scheme is being conducted for the purpose of injuring competitors or destroying competition, specifically in order to drive Counter-claimant Saphena out of the EVH marketplace.  This pricing campaign is being conducted in conjunction with Maquet's other anticompetitive efforts, such as the punitive "sole source" contracts discussed above.  Moreover, Maquet has brought this lawsuit in an effort to drive Saphena out of the EVH marketplace, or to force an acquisition on terms unfavorable to Saphena.

92.    Counter-claimants seek damages in an amount sufficient to compensate for their harm, and a permanent injunction barring Maquet from engaging in further unlawful predatory pricing.

### SECOND COUNTERCLAIM
**(Tortious Interference with Prospective Business Relationships)**

93.    The allegations contained in Paragraphs 1-92 above are incorporated herein by reference.

94.    Maquet and Saphena directly compete for the business of hospitals (both individually and as part of large groups), both in California and nationwide.

95.    Large groups of hospitals are critical to any company competing in the EVH space.  Sales to such groups make up 70% of Maquet's revenue, and a comparable portion of Saphena's revenue.  *See* Ex. 17, at 2.  Lack of access to those customers is severely detrimental to any entrant into the EVH market.

**Answer and Counterclaim of Defendants**        - 45 -        CASE NO. 3:16-CV-07213-WHA

96.     Saphena has lost a number of prospective economic relationships to Maquet in California.  These prospective relationships with potential customers, to whom Saphena marketed the Venapax system, probably would have resulted in an economic benefit to Saphena.

97.     Saphena's Venapax product produces notably superior vessel quality results, as compared to other EVH solutions available, and it has also been designed for greater ease of use by surgeons performing EVH procedures.  Many professionals who have engaged in trials of the Venapax product have noted its superiority to other EVH solutions, as well as its cost-effectiveness.  These are significant drivers of demand for Saphena's product.

98.     Maquet is aware of Saphena's prospective business relationships, as both companies are competing for their business.

99.     Maquet routinely forces its customers to sign sole source contracts, one of which is titled the "Maquet Choice Agreement."

100.    The Maquet Choice Agreement prohibits customers from purchasing competitors' products, or penalizes them for doing so.  At least one such customer has informed Saphena that it is unable even to conduct trials of the Venapax system, despite its desire to do so.  That customer and customers like it are unfairly barred from any products that compete with Maquet's.

101.    Other of Saphena's prospective customer relationships have been disrupted by the anticompetitive and onerous contracts that Maquet forces its customers to sign, and by Maquet's other unlawful business practices.  These include relationships with customers in California.

102.    Maquet intended to disrupt the relationships between Saphena and these prospective customers, in order to prevent Saphena from gaining momentum in the market, and to hamper its efforts to introduce Venapax as a novel and valuable tool for lifesaving medical procedures.

103.    Maquet's efforts to penalize its customers for buying competitors' products are wrongful.  Rather than competing with Saphena and attempting to win customers' business fairly, Maquet seeks to use its substantial market power to prevent Saphena's entrance into the marketplace as a competitor altogether.  Maquet's anticompetitive conduct is wrongful because, *inter alia*, it violates California's Unfair Practices Act and Unfair Competition Law.

**Answer and Counterclaim of Defendants**          - 46 -          CASE NO. 3:16-CV-07213-WHA

104.    As a result of Maquet's wrongful conduct, Saphena has suffered substantial harm in the form of lost sales.  Maquet's onerous contracts are a substantial factor, or in some cases the only factor, preventing customers who want to buy Saphena's products from doing so.

105.    Maquet's conduct constitutes tortious interference with prospective business relations between Saphena and Saphena's customers.

106.    Counter-claimants seek damages in an amount sufficient to compensate for their harm, including lost profits.

### THIRD COUNTERCLAIM
### (Unfair Competition in Violation of California Bus. & Prof. Code § 17200)

107.    The allegations contained in Paragraphs 1-106 above are incorporated herein by reference.

108.    Maquet's attempts to restrict competition in the EVH market are a violation of California's Unfair Competition Law, Bus. & Prof. Code § 17200 *et seq*.

109.    As stated above, Maquet has priced its products for sale to California customers below its fully allocated cost for those products.

110.    These actions by Maquet violate California law, including the Unfair Practices Act, Cal. Bus. & Prof. Code § 17043, which specifically prohibits below-cost sales.  They threaten to harm, and indeed have had the effect of harming, competition in the EVH market in California.

111.    Maquet has also forced its customers, including those in California, to enter into single-source contracts, including but not limited to the Maquet Choice Agreement, which penalizes customers severely for purchasing products from any of Maquet's competitors.

112.    These unfair actions by Maquet significantly threaten or harm competition in the market for EVH equipment.  They represent an attempt by Maquet to use its market power to squash competition and prevent new entrants from bringing their products to market.

113.    Counter-claimants have been damaged and irreparably injured by Maquet's conduct, and will continue to be unless this Court enjoins Maquet's unlawful and anticompetitive conduct.

114.    Counter-claimants seek redress for the harm they have suffered due to Maquet's unlawful conduct, including restitution and a permanent injunction.

**FOURTH COUNTERCLAIM**
**(Loss Leaders in Violation of California Bus. & Prof. Code § 17044)**

115.    The allegations contained in Paragraphs 1-114 above are incorporated herein by reference.

116.    Maquet is engaged in business in California, including its business in the market for EVH solutions.

117.    As discussed above, Maquet sells certain of its EVH products below its fully allocated cost.

118.    Maquet also gives certain of its products to customers for free.  Maquet's purpose in doing so is to influence, promote, or encourage those customers to purchase other Maquet products, rather than buying from Maquet's competitors.  For example, Maquet offers customers (including customers in California) its Vasoview HemoPro Power Supplies and its 7mm endoscopes for free, if they enter into their 100% commitment agreements and also commit to a minimum initial purchase of EVH HemoPro Systems.  These customers are then locked in to purchasing EVH systems from Maquet for years, and cannot engage with competing vendors during that time.

119.    Maquet's fully allocated cost for its Vasoview HemoPro Power Supplies and its 7mm endoscope is greater than zero.

120.    Maquet's intent in offering certain of its products as loss leaders is to injure competitors such as Saphena, and to destroy competition in the EVH marketplace.

121.    Maquet's conduct has caused harm to Saphena.  Saphena has suffered harm in the form of lost revenue from sales and potential sales to buyers of EVH solutions.

**FIFTH COUNTERCLAIM**
**(False Advertising in Violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125)**

122.    The allegations contained in Paragraphs 1-121 above are incorporated herein by reference.

123.    As described above, Maquet has made statements in its advertising and other promotional materials touting the supposed capabilities of the Vasoview line of products, including their ability to reduce thermal spread and the ability of its device to "cut and seal" simultaneously.

124.    The statements described above are false and misleading.

**Answer and Counterclaim of Defendants**          - 48 -          CASE NO. 3:16-CV-07213-WHA

125.     The false and misleading statements made by Maquet either deceived or had the capacity to deceive a substantial segment of the intended consumers of EVH equipment.

126.     This deception to purchasers and users of EVH equipment was likely to influence their purchasing decisions.

127.     Maquet's Vasoview EVH systems are sold in multiple states.  Maquet has thus offered its EVH solutions in interstate commerce.

128.     Maquet's Vasoview EVH systems compete directly with Saphena's Venapax System.

129.     Maquet's false and/or misleading statements regarding its EVH solutions have thus injured, and are likely to continue injuring, Saphena in an amount to be proven at trial.

## SIXTH COUNTERCLAIM
### (Attempted Monopolization In Violation of Section 2 of the Sherman Act)

130.     The allegations contained in Paragraphs 1-129 above are incorporated herein by reference.

131.     By its anticompetitive actions as alleged above, Maquet demonstrates that it has a dangerous probability of achieving monopoly power in the market for EVH solutions among hospitals and other health care providers (both individually and as part of large groups) in California.

132.     Maquet has the requisite specific intent necessary for attempted monopolization. Maquet's specific intent can be inferred from Maquet's predatory and below-cost pricing, its false and misleading statements regarding its product, and the punitive sole source contracts such as the Maquet Choice Agreement, by which Maquet penalizes hospitals for purchasing from any EVH products from a competing manufacturer.

133.     As alleged above, Maquet is engaging in predatory and anticompetitive activities. Maquet's pricing, customer contracts, and statements to the market are predatory and tend to eliminate competition.

134.     Maquet has attempted to monopolize interstate trade and commerce in the market for EVH solutions in California, in violation of Section 2 of the Sherman Act.

135.     In furtherance of this attempt at monopolization, Maquet has pursued the anticompetitive pricing and business strategies detailed above, which have deprived (and will

**Answer and Counterclaim of Defendants**          - 49 -          CASE NO. 3:16-CV-07213-WHA

continue to deprive) other medical device manufacturers of an adequate opportunity to compete effectively in the market for EVH solutions.  This lack of opportunity precludes other medical device manufacturers from entering the EVH marketplace, and threatens to force out those competing in that marketplace.  Maquet's anticompetitive actions have a dangerous probability of successfully monopolizing the EVH market.  As discussed above, Maquet has already achieved as much as 85% market share in the EVH space.

136.    As a result of Maquet's anticompetitive actions, Maquet has injured Plaintiff Saphena and excluded Saphena from competition.  Saphena has lost customers and potential customers due to Maquet's actions in the marketplace, and therefore has lost income and potential income, as well as suffering harm to its goodwill and business reputation.

137.    The harm to Plaintiff Saphena is of the type that the antitrust laws are intended to prohibit and thus constitutes antitrust injury.

## SEVENTH COUNTERCLAIM
### (Unfair Competition in Violation of Mass. Gen. Laws c. 93A, §§ 2 and 11)

138.    The allegations contained in Paragraphs 1-137 above are incorporated herein by reference.

139.    Saphena is a "person" and engages in "trade or commerce" within the meaning of Mass. Gen. Laws c. 93A, § 1.  Maquet is a "person" and engages in "trade or commerce" within the meaning of M.G.L. c. 93A, § 1.

140.    Maquet has offered products below cost, used free products to induce bulk buys, and made false and misleading statements about its products' capabilities, to customers in Massachusetts, as well as those in California. Maquet requires customers in both Massachusetts and California to sign its punitive sole source contracts, such as the Maquet Choice Agreement.

141.    The conduct constituting violations of M.G.L. c. 93A occurred primarily and substantially in Massachusetts.

142.    Maquet's activities as set forth above constitute willful and knowing violations of M.G.L. c. 93A, §§ 2 and 11.

**Answer and Counterclaim of Defendants**          - 50 -          CASE NO. 3:16-CV-07213-WHA

143.    As a result of Maquet's violations of M.G.L. c. 93A, §§ 2 and 11, Saphena has suffered monetary damages and has suffered substantial and irreparable injury and is threatened with further substantial and irreparable harm, for which there is no adequate remedy at law to compensate.

## PRAYER FOR RELIEF

Enter judgment in favor of Counter-claimants, and against Maquet, in an amount to be proved at trial, sufficient to compensate Counter-claimants for Maquet's unlawful efforts to restrain trade, in violation of California Bus. & Prof. Code §§ 17043 and 17044;

Enter judgment in favor of Counter-claimants, and against Maquet, in an amount to be proved at trial, sufficient to provide restitution to Counter-claimants for their expenditures to counteract Maquet's unlawful efforts to restrain trade, in violation of California Bus. & Prof. Code § 17200;

Enter judgment in favor of Counter-claimants, and against Maquet, in an amount to be proved at trial, sufficient to compensate Counter-claimants for Saphena's lost profits due to Maquet's tortious interference with Saphena's prospective business relationships or, in the alternative, in an amount equal to Maquet's unjust enrichment due to its own tortious interference with Saphena's prospective business relationships;

Enter judgment in favor of Counter-claimants, and against Maquet, in an amount to be proved at trial, sufficient to compensate Counter-claimants for Saphena's lost profits due to Maquet's false and misleading advertising in violation of the Lanham Act, 15 U.S.C. § 1125.

Enter judgment in favor of Counter-claimants, and against Maquet, in an amount to be proved at trial, sufficient to compensate Counter-claimants for Saphena's lost profits due to Maquet's violations of the Sherman Act.

Enter judgment in favor of Counter-claimants, and against Maquet, in an amount to be proved at trial, sufficient to compensate Counter-claimants for Saphena's lost profits due to Maquet's violations of Mass. Gen. Laws. c. 93A §§ 2 and 11.

Enter judgment in favor of Counter-claimants, and against Maquet, for Counter-claimants' costs of suit;

Permanently enjoin Maquet from selling any of its EVH products below their fully allocated cost, and from engaging in any other anticompetitive pricing; and,

**Answer and Counterclaim of Defendants**          - 51 -          CASE NO. 3:16-CV-07213-WHA

1    Award such other relief as this Court may deem just and proper.

2

3

4    Dated:  February 22, 2017                    Respectfully submitted,

5                                                By: ___/s/ Karen I. Boyd_____
                                                     Karen I. Boyd (SBN 189808)
6                                                    boyd@turnerboyd.com
                                                     TURNER BOYD LLP
7                                                    702 Marshall Street, Suite 640
                                                     Redwood City, California 94063
8                                                    Telephone:  (650) 521-5930
                                                     Facsimile:  (650) 521-5931
9
                                                     Michael H. Bunis
10                                                   mbunis@choate.com
                                                     Paul D. Popeo
11                                                   ppopeo@choate.com
                                                     Margaret E. Ives
12                                                   mives@choate.com
                                                     William M. Unsworth
13                                                   wunsworth@choate.com
                                                     Vanessa A. Arslanian
14                                                   varslanian@choate.com
                                                     CHOATE, HALL & STEWART LLP
15                                                   Two International Place
                                                     Boston, MA  02110
16                                                   Telephone:  (617) 248-5000
                                                     Facsimile:   (617) 248-4000
17
                                                     Attorneys for Defendants
18                                                   SAPHENA MEDICAL, INC. and
                                                     ALBERT CHIN
19

20

21   7959545

22

23

24

25

26

27

28

**Answer and Counterclaim of Defendants**          - 52 -          CASE NO. 3:16-CV-07213-WHA