IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MAQUET CARDIOVASCULAR LLC,

Plaintiff,

v.

SAPHENA MEDICAL, INC., and
ALBERT CHIN,

Defendants.

No. C 16-07213 WHA

**ORDER GRANTING MOTION TO DISMISS AND HOLDING IN ABEYANCE MOTION TO STAY COUNTERCLAIM**

## INTRODUCTION

Plaintiff in this patent infringement action moves to dismiss defendants' antitrust counterclaim and also moves to stay, sever, or bifurcate the counterclaim. The motion to dismiss is **GRANTED** and the motion to stay is **HELD IN ABEYANCE**.

## STATEMENT

This is an action by plaintiff Maquet Cardiovascular LLC against its former employee, Dr. Albert Chin, and his recently-founded company, Saphena Medical, Inc. The initial complaint filed in December 2016 asserted claims for patent infringement and breach of contract. In February 2017, Maquet amended the complaint to add claims for false advertising in violation of the Lanham Act and for correction of inventorship. Saphena and Dr. Chin then answered and counterclaimed, accusing Maquet of various forms of anticompetitive conduct.

The following is taken from the well-pled allegations of the counterclaim (Dkt. No. 44).[1]

---

[1] Docket number 44 includes both the answer and counterclaim. Paragraph citations are to the latter.

Maquet is a "multinational industry giant in the field of surgical equipment" that has operated for over 175 years. It is based in Germany and part of Getinge Group, a "massive global conglomerate" that markets medical equipment and systems worldwide (*id.* ¶ 43). Among other things, Maquet sells products designed for endoscopic vessel harvesting ("EVH") procedures. Its customers consist primarily of large groups of hospitals (*id.* ¶ 70).

Dr. Chin is an "inventor, engineer, and trained surgeon, who has worked in the conception and development of surgical instruments . . . for more than 20 years" (*id.* ¶ 21). Dr. Chin spent twenty years of his career at Guidant Corporation, where he designed surgical and intravascular instruments (*id.* ¶ 23). In 2008, Maquet acquired Guidant and Dr. Chin became Chief Innovation Officer at Maquet (*id.* ¶ 24).

In 2009, Dr. Chin left Maquet and founded Pavilion Medical Innovations, LLC, an "incubator for innovative medical device companies." Saphena, founded in 2013 by Dr. Chin and non-party Mike Glennon, is one such company (*id.* ¶ 25). Saphena's sole product is Venapax, a device designed for EVH procedures (*id.* ¶¶ 11, 26). Such devices are used to harvest blood vessels for subsequent use as graft material in, *e.g.*, coronary artery bypass graft ("CABG") surgery by cutting the vessels and sealing them off from surrounding branch vessels.

Venapax competes with Vasoview, Maquet's own line of EVH products that originated with a device designed by Dr. Chin at Guidant in 1995 (*id.* ¶¶ 23, 44). Maquet launched its latest Vasoview device, HemoPro 2, in 2010 (*id.* ¶ 45). In a contemporaneous press release, Maquet claimed HemoPro 2 "utilizes next-generation HEMOPRO cut-and-seal technology to reduce thermal spread and to achieve optimal conduit quality for coronary artery bypass graft (CABG) surgery patients" (Dkt. No. 44-13). In February 2017, Maquet's own website contained a one-paragraph overview of HemoPro 2 that described it as "the latest generation of VASOVIEW simultaneous cut-and-seal technology" for EVH (Dkt. No. 44-14).

The overview also claimed HemoPro 2 "virtually eliminates thermal spread and helps harvesters safely acquire high-quality conduits for [CABG] surgery." An asterisk at the end of the foregoing sentence traced to small print at the end of the overview, which stated, "Thermal spread is defined as the extent (length) of thermal injury of the vessel extending laterally

outward from the edge of the HEMOPRO 2 Jaws at the location of the interaction between the Jaws and the vessel" (*ibid.*). Minimization of thermal spread is important for EVH procedures because the cauterization process required to cut and seal blood vessels can damage the cells of the vessel to be harvested. When the harvested vessel is subsequently used as graft material, excessive damage can cause the graft to fail (Dkt. No. 44 ¶ 55).

In August 2014, Maquet executives Michael McCartin, Philip Freed, and Peter Hinchliffe met with Saphena for a demonstration of Venapax's features and benefits. Although Maquet indicated during the meeting that it was "very impressed" and "very intrigued" with Venapax, it did not further discuss "acquisition" with Saphena thereafter (it is unclear whether the counterclaim means "acquisition" of Venapax or of Saphena) (*id.* ¶¶ 67–68).

Maquet's contracts with its customers offer significant discounts or rebates when customers purchase all their EVH products from Maquet for a certain period of time, up to four years. Maquet also offers further discounts and promotions when customers buy "bundles" of devices and accessories. In addition, Maquet offers its customers incentive rebates on overall prices for maintaining exclusive commitment to Maquet products (*id.* ¶¶ 70–76). Maquet's customers who benefit from its contract discounts, promotions, and rebates include large groups of hospitals with member hospitals in California and Massachusetts (*id.* ¶¶ 80–81). Maquet currently "controls" approximately 85 percent of the market for EVH products (*id.* ¶ 13).

Maquet's business practices have caused difficulties for Saphena. For example, in January 2017, a "potential customer" hospital in Georgia rebuffed Saphena's attempt to pitch Venapax to its physician's assistants because "purchasing any Venapax devices could result in both a loss of rebates associated with their agreement [with Maquet] and substantial increases in [prices for] their purchase of other Maquet products (not just EVH devices), not only for them, but [also for] other hospitals on the agreement as well." Similarly, "another large group of hospitals, whose members include several California hospitals, recently informed Saphena that they could only use EVH equipment that is already part of its fixed, bundled cardiac artery bypass grafting payment system" from Maquet (*id.* ¶¶ 78–79).

3

Based on the foregoing allegations, Saphena and Dr. Chin assert counterclaims against Maquet for (1) below-cost sales in violation of California law, (2) tortious interference with prospective business relationships, (3) unfair competition in violation of California law, (4) loss leaders in violation of California law, (5) false advertising in violation of the Lanham Act, (6) attempted monopolization in violation of Section 2 of the Sherman Act, and (7) unfair competition in violation of Massachusetts law.

Maquet moves to dismiss all counterclaims under Rule 12(b)(6). Additionally, Maquet moves to stay, sever, or bifurcate the counterclaims as this litigation progresses. This order follows full briefing and oral argument.

**ANALYSIS**

**1. MOTION TO DISMISS.**

To survive a motion to dismiss, defendants' counterclaim must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when the party asserting it pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When ruling on a motion to dismiss, a court may generally consider only allegations in the pleadings, attached exhibits, and matters properly subject to judicial notice. The court accepts factual allegations in the complaint (or counterclaim) as true and construes the pleadings in the light most favorable to the nonmoving party. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1030–31 (9th Cir. 2008). Conclusory allegations or "formulaic recitation of the elements" of a claim, however, are not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 681.

As an initial matter, Maquet contends Dr. Chin lacks standing to assert the counterclaims because they do not allege that he suffered any injury (Dkt. No. 62 at 22). Defendants do not deny this. Indeed, they offer in their opposition brief to "stipulate that, going forward, all seven of their Counterclaims will be pursued by Defendant Saphena alone" (Dkt. No. 66 at 21). This order therefore discusses the counterclaims only as asserted by Saphena.

### A. Below-Cost Sales.

Section 17043 of the California Business and Professions Code states, "It is unlawful for any person engaged in business within this State to sell any article or product at less than the cost thereof to such vendor, or to give away any article or product, for the purpose of injuring competitors or destroying competition." Saphena claims Maquet sells certain Vasoview EVH systems "below its fully allocated costs of producing and distributing those products" in violation of this provision (Dkt. No. 44 ¶ 88).

Specifically, Saphena alleges that Maquet "purchases [its] Vasoview EVH systems from its corporate parent for a cost of up to $750." Saphena also alleges that Maquet sells certain Vasoview EVH systems to customers for less than $750 as a result of various discounts, promotions, and rebates. For example, some Maquet customers can purchase the Vasoview 6 EVH System "for as little as $650." Thus, Saphena contends, Maquet violates Section 17043 because it "must sell its Vasoview EVH systems at above $750 in order to realize any margin." Saphena further alleges that "Maquet's predatory pricing scheme is being conducted for the purpose of injuring competitors or destroying competition, specifically in order to drive Counter-claimant Saphena out of the EVH marketplace" (*id.* ¶¶ 82–92).

The foregoing allegations fail to state a plausible claim for relief under Section 17043. *First*, the allegations fail to set forth factual contents showing that Maquet ever actually sold a product below cost. Assuming as true that Maquet purchases Vasoview EVH systems from its corporate parent for a cost of *up to* $750, it does not follow that all such purchases cost *at least* $750. According to the counterclaim, then, it remains perfectly possible that Maquet simply bought certain Vasoview EVH systems from its corporate parent for *less than* $750 and also sold those systems to customers for less than $750. This scenario would not necessarily constitute a below-cost sale in violation of Section 17043.[2]

---

[2] The counterclaim alleges that Maquet also offers bundle deals to customers. During oral argument, defense counsel suggested that such "bundles arrangements" constitute unlawful below-cost sales because "Maquet gives free of charge a number of devices away" (Dkt. No. 80 at 18:24–19:8). This reasoning distorts the very concept of bundling by assigning costs and profit margins to individual products within a bundle while ignoring the cost and profit margin of the bundle as a whole. Under this approach, Section 17043 could outlaw virtually any bundle deal — including, for example, BOGO promotions ubiquitous in innumerable markets.

5

*Second*, the allegation that Maquet sets its prices "for the purpose of injuring competitors or destroying competition" is conclusory. It appears to be merely formulaic recitation of Section 17043's requirement that any below-cost sale prohibited thereunder be "for the purpose of injuring competitors or destroying competition." As such, it is not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 681. The tacked-on qualifier — "specifically in order to drive Counter-claimant Saphena out of the EVH marketplace" — fares no better. It is conclusory at best and implausible at worst. The counterclaim alleges that Maquet has operated in the medical industry for nearly two hundred years and in the EVH market for nearly a decade. The counterclaim describes Maquet's discounts, promotions, and rebates as part of an overall business model of enormous scale. It is not reasonable to infer from the counterclaim that Maquet adopted its long-term business model *specifically* for the purpose of targeting Saphena, a recent market entrant. At the very least, more factual allegations would be required to nudge that suggestion across the line from *conceivable* to *plausible*. *See id.* at 680.

In short, the counterclaim fails to set forth factual allegations showing that Maquet sold products below cost for the purpose of injuring competitors or destroying competition. It therefore does not state a claim for violation of Section 17043.

### B. Tortious Interference with Prospective Business Relationship.

The elements of the tort of intentional interference with prospective economic advantage in this case are (1) an economic relationship between Saphena and some third party, with probable future economic benefit to Saphena, (2) Maquet's knowledge of the relationship, (3) intentional acts by Maquet designed to disrupt the relationship, (4) actual disruption of the relationship, and (5) economic harm to Saphena proximately caused by Maquet's acts. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1153 (2003).

The counterclaim fails to plead factual allegations sufficient to show at least two of the foregoing elements. *First*, Saphena cites *Lowell v. Mother's Cake & Cookie Co.*, 79 Cal. App. 3d 13, 19 (1978), for the proposition that a party can state a cause of action for tortious interference when it "received several offers from potential purchasers" before another party's interference stopped the purchase (Dkt. No. 66 at 8–9). But that is not our case. Saphena does

6

not allege that it received any offers from potential purchasers. On the contrary, the counterclaim identifies only two "potential purchasers" — a hospital in Georgia and a group of hospitals with members in California. The former rebuffed even Saphena's attempt to pitch Venapax to its employees, stopping the talking process at the threshold. The counterclaim is also silent on the circumstances under which the group of hospitals "informed" Saphena that they could only use Maquet's equipment. Probable future economic benefit to Saphena cannot reasonably be inferred from these allegations. *See Westwide Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 527–28 (1996) (distinguishing allegations in *Lowell*, which "show[ed] with a reasonable degree of certainty both that there were several actual buyers for the company and the amounts they were willing to pay," from allegations showing "at most a hope for an economic relationship and a desire for future benefit").

*Second*, Saphena's opposition brief identifies five allegations supposedly showing that Maquet knew of its purported "relationship" with potential purchasers, but none actually support that conclusion. That Saphena "engaged in negotiations with particular potential customers" says nothing about Maquet's knowledge (*see* Dkt. No. 66 at 11). That "Maquet is aware of Saphena's prospective business relationships [because] both companies are competing for their business" is conclusory and a non sequitur since companies can compete in the same market without ever knowing about each other's economic relationships (*see* Dkt. No. 44 ¶ 98). That Maquet "engineer[s] barriers between Saphena and those potential customers" is conclusory insofar as it suggests the "engineering" is intentional (*see id.* ¶ 77). That "Maquet intended to disrupt the relationships between Saphena and these prospective customers" is conclusory (*id.* ¶ 102). That "these relationships have in fact been disrupted" again says nothing about Maquet's knowledge (*see* Dkt. No. 66 at 11).

When two competitors try to win a sale from the same customer, usually one will win and the other will lose. The loser cannot, based on the loss alone, claim that such competition is "tortious interference." To the contrary, vigorous competition is the American way, and the very premise of our antitrust laws. In short, the counterclaim fails to set forth factual allegations showing that Saphena had an economic relationship with a third party and that

7

Maquet knew of the relationship. It therefore does not state a claim for tortious interference with prospective economic advantage.

### C. Unfair Competition (California).

Section 17200 of the California Business and Professions Code defines "unfair competition" as "any unlawful, unfair or fraudulent business act or practice . . . ." According to the counterclaim, Maquet engaged in unfair competition by (1) selling below cost in violation of Section 17043 and (2) "forc[ing] its customers, including those in California, to enter into single-source contracts . . . which penalize[] customers severely for purchasing products from any of Maquet's competitors" (Dkt. No. 44 ¶¶ 107–114).[3]

As explained, the counterclaim has not alleged sufficient facts to show any sale below cost in violation of Section 17043. Such violation therefore cannot be the basis for an unfair competition claim under Section 17200. Nor does the counterclaim set forth facts showing that Maquet *forced* anyone to contract with it. At most, the counterclaim alleges that Maquet's contracts are designed to give customers steep discounts if they buy exclusively from Maquet. It is merely attorney argument to describe such contracts as "penaliz[ing] customers severely for purchasing products from any of Maquet's competitors."

### D. Loss Leaders.

Section 17044 of the California Business and Professions Code states, "It is unlawful for any person engaged in business within this State to sell or use any article or product as a 'loss leader' as defined in Section 17030 of this chapter." Section 17030 defines "loss leader" as any article or product sold at less than cost where (a) the purpose is to induce, promote, or encourage the purchase of other merchandise; (b) the effect is a tendency or capacity to mislead or deceive purchasers or prospective purchasers; or (c) the effect is to divert trade from or otherwise injure competitors. Since the counterclaim does not allege facts showing that Maquet sold any products at less than cost, it also fails to state a claim for violation of Section 17044.

---

[3] In its opposition brief, Saphena claims it pled "at least four separate predicates for its Section 17200 claim" (Dkt. No. 66 at 12). Not so. This order looks to the counterclaim itself, not to Saphena's opposition brief, to discern whether any predicate has been sufficiently pled for Saphena's Section 17200 claim.

8

### E. False Advertising.

A false advertising claim under the Lanham Act in this case requires that (1) Maquet made a false statement of fact in a commercial advertisement about its own or another's product, (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience, (3) the deception is material in that it is likely to influence the purchasing decision, (4) Maquet caused its false statement to enter interstate commerce, and (5) Saphena has been or is likely to be injured as a result of the false statement. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).

Saphena claims Maquet made two false or misleading statements in violation of the Lanham Act. This order addresses each in turn.

*First*, according to the counterclaim, Maquet's 2010 press release claimed HemoPro 2 "reduce[s] thermal spread" (Dkt. No. 44-13). Also, as recently as February 2017, Maquet's website claimed HemoPro 2 "virtually eliminates thermal spread," where "thermal spread" is defined as "the extent (length) of thermal injury of the vessel extending laterally outward from the edge of the HEMOPRO 2 Jaws at the location of the interaction between the Jaws and the vessel" (Dkt. No. 44-14). The counterclaim attempts to impeach the foregoing statements by cherry-picking phrases from Maquet's instructions for using HemoPro 2. For example, the counterclaim says the "instructions contain numerous warnings regarding the HemoPro 2 causing 'thermal injury to tissue'" (Dkt. No. 44 ¶ 129). Actually, the phrase "thermal injury to tissue" appears only once, in an instruction that reads, "If visualization of the surgical site is impaired, do not initiate or continue activation of energy to the HEMOPRO 2 Jaws to avoid thermal injury to tissue" (Dkt. No. 44-1 at 9).[4]

This and other allegations in support of Saphena's false advertising counterclaim indicate only that (1) HemoPro 2 operates using thermal energy, and (2) improper use of the device — *e.g.*, when the user has no clear view of the surgical site — can still lead to injury.

---

[4] Another instruction reads, "Use caution when the target anatomy to be placed between the HEMOPRO 2 Jaws is located close to the skin surface as this situation may cause thermal injury to the skin surface and related structures" (Dkt. No. 44-1 at 10). Such injury, however, does not fit within Maquet's definition of "thermal spread."

9

But Maquet's audience would not reasonably read its accused statements to mean that HemoPro 2 does *not* use thermal energy, or that "thermal spread" — a phenomenon that, according to the counterclaim itself, is a well-known challenge associated with EVH in general (*see, e.g.*, Dkt. No. 44 ¶ 28) — includes thermal injury resulting from *improper* use of the device.

*Second*, according to the counterclaim, Maquet's website in February 2017 claimed that HemoPro 2 offers "simultaneous cut-and-seal technology" for EVH (Dkt. No. 44-14). This statement is false or misleading, the counterclaim contends, because Maquet's own training materials for HemoPro 2 describe a five-step "CLAMP method" for cutting and sealing branch vessels (Dkt. No. 44 ¶ 63). Actually, the CLAMP method instructs (Dkt. No. 44-15):

**Clean the Jaws.**

- Tissue build-up may impact visibility
- Jaws should be cleaned with saline-soaked gauze

**Locate the vessel in the center of the Jaws.**

- Keep the tips of the Jaws **toward** the main conduit
- Keep the spot cautery area of the Jaws **away** from the main conduit or sensitive tissue

**Activation of energy.**

- For routine branch or tissue division, activate ONLY when material is placed between the Jaws
- For use of the spot cautery feature, activation can be performed without material between the Jaws. Always ensure cautery area is in contact with the tissue intended to be cauterized

**Mild tension when cutting and sealing vessel branches.**

- Slight rotation or retraction of the Harvesting Tool or C-Ring should be sufficient

**Pull when cutting fascia.**

- Perform fasciotomy by grasping the tissue with the Jaws and then pulling/rotating the tool while activating the device
- Increased tension aids in cutting fascia

Nothing in the foregoing contradicts Maquet's statement that HemoPro 2 contains technology allowing the actual cutting and sealing of a vessel to occur simultaneously. Put differently, that

multiple steps (like cleaning and activation) are required in the overall process to cut and seal a vessel does not mean that HemoPro 2's technology cuts and seals the vessel at different times.

In short, the counterclaim fails to state a claim for false advertising in violation of the Lanham Act because it does not plead factual allegations showing that Maquet made false or misleading statements likely to deceive a substantial segment of its audience.

### F. Attempted Monopolization.

A claim for attempted monopolization under Section 2 of the Sherman Act in this case requires (1) that Maquet engaged in predatory or anticompetitive conduct with (2) specific intent to monopolize and (3) a dangerous probability of achieving monopoly power. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). The counterclaim merely piggybacks off of previously-asserted allegations under other claims for relief. For example, it claims that "Maquet's pricing, customer contracts, and statements to the market are predatory and tend to eliminate competition," and "Maquet's specific intent [to monopolize] can be inferred from [its] predatory and below-cost pricing, its false and misleading statements regarding its product, and the punitive sole source contracts . . . by which Maquet penalizes hospitals for purchasing . . . any EVH products from a competing manufacturer" (Dkt. No. 44 ¶¶ 132–33). But, as stated, the counterclaim fails to allege facts showing "predatory and below-cost pricing," "false and misleading statements," or "punitive sole source contracts." Without these predicates, the counterclaim also fails to state a claim for attempted monopolization under the Sherman Act.

In briefing and during oral argument, counsel for Saphena also argued that it is anticompetitive of Maquet to "lock" its customers into buying solely from Maquet by setting up contracts so that if even one member hospital defects to a competitor, all member hospitals lose their discounts, promotions, and rebates with Maquet (*see* Dkt. Nos. 44 ¶ 70; 80 at 11:5–14:21). For present purposes, the *factual* description of Maquet's customer agreements is taken as true, as far as it goes, but it is not the whole story.

The "member hospitals" counsel described belong to group purchasing organizations (GPOs) of hospitals that *voluntarily and strategically aggregate themselves* to purchase medical supplies. In doing so, GPOs increase both their purchasing and bargaining power with

11

manufacturers. According to the counterclaim, GPOs are "critical to any company competing in the EVH space" and "make up nearly 70 percent of Maquet's current revenues" (Dkt. Nos. 44 ¶¶ 77, 95; 66 at 9). In other words, hospitals combine into groups to deal with medical supply manufacturers in order to benefit from prices and bargains they could not access individually. So it is *not*, as Saphena insinuates, that Maquet somehow *forces* hospitals to deal in groups. The counterclaim does not allege, for example, that Maquet forced any individual hospital into a group contract against its will. Rather, it is simply the reality of the market presented to manufacturers that GPOs represent "critical" customers because they buy medical supplies in bulk, thus offering far greater profitability than do individual hospitals.

The significance of this market reality is twofold. *First*, it absolves Maquet of the accusation of anticompetitive conduct insofar as that accusation is based on insinuations that Maquet somehow contractually coerces customers into dealing as a group in order to maintain exclusivity. Contrary to the counterclaim, the "barriers" to entry Saphena complains of are not "engineered" by Maquet (*see* Dkt. No. 44 ¶ 77). They arise from the demand side of the market — the GPOs. *Second*, according to the counterclaim's own allegations, Maquet's conduct appears to be ordinary competition in this particular market. Maquet, like every other manufacturer — including Saphena — must deal with GPOs on a group-by-group basis simply because that is how GPOs work, not because of any sinister conditions imposed by Maquet. If Saphena wants to compete, it must attempt to woo entire GPOs away from competitors like Maquet simply because — according to the counterclaim — GPOs "are critical to any company competing in the EVH space" (*see id.* ¶ 95). If Saphena fails to attract entire GPOs away from Maquet — or to convince individual hospitals to break ranks with their GPOs — it cannot pin blame for that failure on the competition.

### G. Unfair Competition (Massachusetts).

Section 2 of Chapter 93A of the Massachusetts General Laws declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Section 11, which provides a private cause of action for violations of Section 2, further states, "No action shall be brought or maintained under this section unless the

12

actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth."

The counterclaim merely recites, "The conduct constituting violations of M.G.L. c. 93A occurred primarily and substantially in Massachusetts" (Dkt. No. 44 ¶ 141). This is conclusory. In its opposition brief, Saphena argues that it can survive dismissal if it "has its principal place of business in Massachusetts, and the injury it complains of is the interference with its sales efforts in Massachusetts" (Dkt. No. 66 at 20). Saphena cites for support *Jofran Sales, Inc. v. Watkins & Shepard Trucking, Inc.*, which noted, "Although the inquiry is generally a holistic one, at the pleading stage a § 11 claim may survive a motion to dismiss based on a 'primarily and substantially' challenge upon a showing that the plaintiff is located in Massachusetts and that the injury occurred in Massachusetts." 216 F. Supp. 3d 206 (D. Mass. 2016) (Judge Frank Saylor). The same "fact-intensive approach" required in *Jofran* to determine "whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth," however, compels rejection of the counterclaim here.

The gravamen of *Jofran* was a contract dispute between a plaintiff wholesale furniture supplier and defendant trucking and freight management company. The complaint alleged that the defendant failed to properly store the plaintiff's furniture inventory and alleged specific facts concerning the parties' actions in Massachusetts. Here, in contrast, the gravamen of Saphena's counterclaim is that a "multinational industry giant" adopted a comprehensive anticompetitive business model in violation of California and federal laws. The only geographically specific allegations in the counterclaim concern Saphena's failed attempts to deal with a hospital in Georgia and a GPO with members in California, and its meeting with Maquet at Saphena's headquarters in Massachusetts (which meeting is not alleged to be a predicate of any unlawful conduct). The counterclaim mentions that Maquet has customers in Massachusetts, but for a corporation of Maquet's size this is practically a given (*see* Dkt. No. 44 ¶¶ 81, 140). It certainly does not indicate that the "center of gravity of the circumstances" giving rise to Saphena's sweeping allegations of anticompetitive conduct somehow falls in Massachusetts (as opposed to anywhere else Maquet might have customers).

Taken as a whole, the counterclaim fails to state a claim for violation of Massachusetts law because it does not plausibly allege that "the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within" Massachusetts.

### 2. MOTION TO STAY.

Because this order concludes Saphena's counterclaim fails to state a claim for relief, it does not reach Maquet's separate motion to stay, sever, or bifurcate the counterclaim. This order disagrees, however, with Maquet's bald assertion that dismissal here should be with prejudice (Dkt. Nos. 62 at 2, 22; 73 at 14). *See* F.R.C.P. 15(a) ("The court should freely give leave [to amend] when justice so requires."); *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (absent certain factors not shown here, "there exists a *presumption* under Rule 15(a) in favor of granting leave to amend"). If Saphena opts to re-plead its counterclaim, Maquet will likely wish to revive its motion to stay. Thus, to avoid unnecessary duplication of filings, the Court will hold Maquet's motion to stay in abeyance pending either a properly pled counterclaim or dismissal of the counterclaim with prejudice.

### CONCLUSION

For the foregoing reasons, plaintiff's motion to dismiss the counterclaim is **GRANTED** and its motion to stay is **HELD IN ABEYANCE**. Defendants may move for leave to file an amended counterclaim by **JUNE 8 AT NOON**. Any such motion should include as an exhibit a redlined version of the proposed amended counterclaim that clearly identifies all changes from the initial counterclaim. This order and the Court's ruling on the record on May 18 (*see* Dkt. Nos. 79–81) also resolve defendants' pending discovery dispute (Dkt. No. 76).

**IT IS SO ORDERED.**

Dated: May 26, 2017.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

14